WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE
This case was tried before a jury from November 14-22, 2016. The sole issue was whether in 2013 DentaQuest USA Insurance Co., Inc. ("DentaQuest"), retaliated against Snodgrass-King Pediatric Dental Associates, P.C., and David J. Snodgrass, D.D.S. (collectively "Snodgrass-King"), in violation of the First Amendment to the United States Constitution. (Doc. No. 331.) The jury returned a verdict in favor of Snodgrass-King for $7.4 million in compensatory damages and $14.8 million in punitive damages. (Doc. No. 391.) Before the Court are Snodgrass-King's Motions to Alter Judgment to Provide for Prejudgment Interest and Post-Judgment Interest (Doc. No. 410), for Attorney's Fees (Doc. No. 418), and to Supplement Motion for Attorney's Fees (Doc. No. 446). Also before the Court are DentaQuest's Motion for Judgment as a Matter of Law (Doc. No. 411) and for a New Trial (Doc. No. 413). On February 20, 2018, the Court heard oral argument on DentaQuest's Motion for Judgment as a Matter of Law (Doc. No. 411). For the following reasons, DentaQuest's Motion for Judgment as a Matter of Law (Doc. No. 411) is GRANTED , DentaQuest's Motion for a New Trial (Doc. No. 413) is CONDITIONALLY GRANTED , and Snodgrass-King's Motions to Alter Judgment (Doc. No. 410) and for Attorney's Fees (Doc. Nos. 408, 446) are DENIED AS MOOT .
I. JUDGMENT AS A MATTER OF LAW
DentaQuest argues that no reasonable jury could find that it was a state actor in its exclusion of Snodgrass-King from the TennCare network in 2013 for the purposes of 28 U.S.C. § 1983. (Doc. No. 412 at 6.) Alternatively, DentaQuest contends that no reasonable jury could find that Snodgrass-King established a First Amendment violation. (Id. at 19.)
Under Federal Rule of Civil Procedure 50(b), a court may grant a motion for judgment as a matter of law "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the *850 jury, and reasonable minds could come to but one conclusion, in favor of the moving party." Radvansky v. City of Olmsted, 496 F.3d 609, 614 (6th Cir. 2007). The party seeking a judgment as a matter of law must "overcome the substantial deference owed a jury verdict." Id. The court may not "reweigh the evidence or assess the credibility of witnesses." Id.
A. EVIDENCE AT TRIAL
Snodgrass-King is a multi-office dental practice group that has five dental offices in middle Tennessee. (Doc. No. 399 at 83.) Its offices are located in Williamson, Davidson, Wilson, and Rutherford Counties. (Doc. No. 400 at 194.) The practice encompasses all types of dentistry, including orthodontics, pediatric and adult dentistry, and oral surgery. (Doc. No. 399 at 84.) Snodgrass-King treated TennCare dental patients, who are generally under the age of twenty-one, until 2003, and then again from 2009-13. (Doc. No. 400 at 67, 69.) Snodgrass-King also participates in the CoverKids network, another state government assistance dental network for children. (Doc. No. 403 at 91.) Testifying for Snodgrass-King were its two partners, Snodgrass and John Terry King, D.D.S. (Doc. No. 400 at 57, 118.) Two other dentists who work for Snodgrass-King, Miriam Hall, D.D.S., and Crystal Gilreath Rucker, D.M.D., also testified at trial. (Doc. No. 399 at 75; Doc. No. 400 at 29.)
For the purposes of this Opinion, TennCare is a state entity that pays certain fees for medical procedures for persons who are unable to pay.[1] (Doc. No. 400 at 39-40.) Tennessee is not an "any willing provider state," meaning that it does not have to include any and all willing providers who desire to participate in its TennCare network. (Id. at 200-01.) Instead, TennCare uses a Dental Benefits Manager to contract with a network of dental providers to treat its patients for reimbursement. (Id. at 200; Doc. No. 403 at 11.)
Dr. James Gillcrist was the Dental Director of the Bureau of TennCare ("TennCare") at all times relevant to this lawsuit. (Doc. No. 400 at 164; Doc. No. 404 at 131.) Wendy Long, M.D., was the Chief Medical Officer of TennCare during the same timeframe.[2] (Doc. No. 449-1 at 29; Ex. 152 at 22327.) Manny Martins was the Deputy Director of Finance and Administration in 2001, and subsequently became Director of the Bureau of TennCare at the time of Snodgrass-King's 2003 termination from the TennCare network. (Doc. No. 400 at 171.) No one from TennCare testified at trial.[3]
DentaQuest has been the Dental Benefits Manager for TennCare since 2013. From 2002 to 2010, Doral Dental of Tennessee, LLC ("Doral") was TennCare's *851 Dental Benefits Manager. (Doc. No. 403 at 11.) In 2004, DentaQuest, LLC, purchased the membership interest in Doral. (Id. ) Doral subsequently changed its name to DentaQuest of TennCare, LLC, to reflect its new status as a DentaQuest company. (Id. ) "[A] number of individuals who played significant roles in the success of [Doral's work with] the TennCare program from 2002-2010 are still with [DentaQuest, LLC in 2013]" and remained involved in DentaQuest's operation of the TennCare dental network. (Doc. No. 449-1 at 14; Ex. 9 at 546.)
1. Doral's 2003 Decision to Exclude Snodgrass-King From the TennCare Network
Starting around 2001, Snodgrass voiced his concerns about the management of the TennCare network to a number of Tennessee officials. (Doc. No. 400 at 140; Ex. 59 at 120.) Snodgrass testified: "I've voiced my concerns to my state representatives, to my U.S. congressman, to my U.S. senator. I've voiced my concerns to governmental-every governmental official that I knew the name of." (Doc. No. 400 at 140.) He wrote letters critical of Doral and TennCare to Governor Phil Bredesen (Ex. 59 at 132), as well as directly to TennCare officials (Ex. 59 at 120, 132).
On May 16, 2003, Doral's Tennessee peer review committee, consisting of Chairman F. William Taylor, D.D.S., four other dentists, and Doral Executive Michelle Blackwell, reviewed twenty of Snodgrass' patient files. (Doc. No. 398 at 218, 248; Ex. 608.) Doral kept the provider name confidential, so that the peer review committee did not know whose files it was reviewing. (Doc. No. 406 at 36.) Blackwell, Doral's non-dentist representative, composed the agenda and provided the record, while the Tennessee-licensed dentists made the findings of fact and recommendations. (Id. at 68.) The Tennessee peer review committee found that Snodgrass excessively utilized stainless steel crowns, and recommended Snodgrass' termination from the TennCare network. (Doc. No. 398 at 224; Ex. 611.) The Tennessee peer review committee sent that recommendation to Doral. (Doc. No. 398 at 239-40; Doc. No. 406 at 50.)
On May 30, 2003, Doral acted on that recommendation when Norris Knight, D.D.S., the Credential Committee Chairman for Doral, sent a letter to Snodgrass explaining that Snodgrass was too aggressive in his use of stainless steel crowns. (Ex. 612.) That letter did not state that Snodgrass soon would be terminated, but rather that he would be subject to "revised criteria requirements" to determine the medical necessity of some stainless steel crowns procedures. (Id . ) Snodgrass explained that he used more stainless steel crowns than other doctors because his patients consisted of children with the greatest medical problems that needed more aggressive treatment. (Doc. No. 400 at 280.)
On July 1, 2003, Doral terminated, without cause, all Snodgrass-King providers from participating in the TennCare network, effective July 9, 2003. (Id. at 69-70, 136, 256.) After Snodgrass inquired about the reason Doral excluded him, he learned that Doral's Tennessee peer review committee had recommended his termination. (Id. at 243; Ex. 611.) Doral executive Steven Pollock took part in the decision to terminate Snodgrass-King, along with Blackwell and other executives. (Doc. No. 449-1 at 5-6.) Pollock testified that TennCare had concerns about including Snodgrass in the network, and, as TennCare was Doral's customer, Doral discussed with TennCare how to handle Snodgrass. (Id. at 21.)
*852 The relationship between the State and Snodgrass-King continued to grow more tense. At some point in 2003, Snodgrass informed Nashville's Channel 4 News about his termination from the TennCare network. (Doc. No. 404 at 135.) Channel 4's Investigative Team went to Gillcrist's house to interview him about that decision. (Id. at 135-36.) On July 16, 2003, David Florsheim, an account management employee for Doral, wrote a letter to Pollock, Director of Provider Services Marcel Tetzlaff, Brett Bostrack, and two other Doral management employees, explaining that Florsheim had a conversation with Gillcrist about Snodgrass directing his patients to call the State and TennCare about his termination from the network. (Doc. No. 449-1 at 25-26.) Gillcrist said that TennCare and the governor's office had been "inundated with calls" by the Snodgrass-King patients. (Id. at 26.)
In mid-July 2003, Gillcrist called King to inform him that Snodgrass-King's patients were calling Gillcrist's office and the governor's office about the termination. (Doc. No. 400 at 72-74.) He told King that if his patients did not stop writing letters to and calling his office and the governor's officee, he would have Snodgrass-King "investigated" and "shut down." (Id. at 75-76.) On July 24, 2003, Dr. Taylor emailed Gillcrist, Blackwell, and four other people stating that a video on a Knoxville, Tennessee, news channel about Snodgrass-King's termination from the TennCare network was "ridiculous." (Doc. No. 398 at 252; Ex. 111.) On July 29, 2003, the Tennessee Bureau of Investigation ("TBI") initiated an audit of Snodgrass-King. (Doc. No. 400 at 76, 158.) The audit found nothing out of the ordinary, and the TBI closed the matter on September 10, 2004. (Id. at 78, 158.)
On June 24, 2004, Blackwell sent an email to Bostrack, Pollock, and other DentaQuest management employees. (Doc. No. 404 at 136-37.) In it, she stated that Gillcrist asked for Doral to update Martins on any potential litigation by Snodgrass regarding his termination from the network. (Id. at 139; Ex. 113 at 6402.) Snodgrass had not filed a lawsuit at that time. (Doc. No. 404 at 139.)
In 2006, two dentists from Snodgrass-King applied to rejoin the TennCare network of providers. Doral denied their applications despite Blackwell admitting that Doral could use pediatric dentists in its network in Williamson County. (Doc. No. 400 at 143; Doc. No. 403 at 11-12.) In 2007, five Snodgrass-King dentists applied to rejoin the TennCare network of providers, and Doral denied their applications. (Doc. No. 400 at 143.) Snodgrass testified that this was the straw that broke the camel's back that led to the ten years of litigation between the parties. (Id. )
2. The 2008 Lawsuit Challenging the 2003 Decision to Exclude Snodgrass-King from the TennCare Network
In 2008, Snodgrass filed a lawsuit against Doral based on the 2003 exclusion of all Snodgrass-King providers from the TennCare network. (Doc. No. 400 at 112; Ex. 57.) Snodgrass brought the lawsuit under 42 U.S.C. § 1983, alleging multiple constitutional violations, including First Amendment retaliation. (Ex. 57.) On March 17, 2009, Snodgrass-King and Doral settled the case, with Doral continuing to deny liability. (Doc. No. 400 at 248; Ex. 32 at 4636.) As part of the settlement, however, Doral reimbursed Snodgrass' costs and attorney's fees, donated money to the University of Tennessee, its College of Dentistry, and Meharry Medical College of Dentistry. (Doc. No. 400 at 146; Ex. 32 at 4632.) Doral also agreed to include all of Snodgrass-King's providers in the TennCare network. (Doc. No. 400 at 146; Ex. 32 at 4633.) This agreement bound all of Doral's *853 "heirs, executors, legal representatives, successors and assigns." (Ex. 32 at 4635.)
On April 24, 2009, as part of the settlement of the 2008 lawsuit, Doral was in the process of credentialing the Snodgrass-King providers when DentaQuest's Senior Vice President of Dental Management Kevin Klein had a "heated" discussion with TennCare. (Doc. No. 449-1 at 28; Ex. 330 at 22332.) Wendy Long asked Klein to delay credentialing Snodgrass-King providers so that TennCare could review a new policy it was issuing. (Ex. 330 at 22332.) However, when Snodgrass threatened "aggressive action" against Doral if it did not finish credentialing his providers, Doral felt it had no choice but to do so. (Id. ) Klein informed Pollock, who is now Doral's President, that TennCare "has a policy directly related to [S]nodgrass which [he thought was] designed to keep him out or [Doral would] incur penalties." (Id. ) Under the settlement agreement of the 2008 lawsuit, however, Doral was obligated to allow Snodgrass-King into the network, so Klein was "worried about" Doral's relationship with TennCare when Long expressed resistance. (Id. )
On May 7, 2009, Pollock sent Long a letter regarding TennCare's "recently implemented Policy and Procedures for Reinstatement of Terminated Providers." (Doc. No. 449-1 at 29; Ex. 152 at 22327.) Pollock told Long that Doral could not implement this Policy when reinstating Snodgrass-King's providers because Doral had already credentialed his providers. (Ex. 152 at 22327.) Pollock explained that he could not legally interfere with the settlement agreement without Snodgrass' consent, and he needed time to "work through details of this unique situation and appropriately respond to TennCare's requirements." (Id. )
On May 15, 2009, Blackwell sent a letter to Long detailing that Doral was reinstating Snodgrass-King's providers in the network and planned to monitor Snodgrass' billing practices and treatment decisions. (Ex. 59 at 22-23.) Klein sent Pollock a follow-up email on May 26, 2009, which Pollock forwarded to DentaQuest's Chief Executive Officer Fay Donohue, stating that Doral had reached an agreement with TennCare and needed to get Snodgrass to consent to it. (Ex. 333 at 18748.) Based on the agreement with the State, Doral began requiring Snodgrass to obtain prior approval for every stainless steel crown that he would install. (Doc. No. 400 at 148; Doc. No. 403 at 12.) This protocol only applied to Snodgrass. (Doc. No. 403 at 12.) Snodgrass refused to comply with this protocol because he did not feel it was necessary to do so. (Doc. No. 400 at 149.) As a result, Doral withheld payment for work done by Snodgrass. (Id. ) Doral's action resulted in a new lawsuit.
3. The 2010 Lawsuit
On March 23, 2010, Snodgrass filed a second lawsuit, this time against DentaQuest of Tennessee, LLC, and the State of Tennessee, and multiple State officials, including Gillcrist. (Id. at 113, 150; Ex. 59.) Snodgrass alleged multiple federal constitutional violations, as well as an interference with contractual relationship claim. (Ex. 59.) He alleged that "DentaQuest received pressure from Defendant Bureau of TennCare's then Director, Manny Martins, to terminate [Snodgrass] as a provider." (Id. at 95.) On February 24, 2011, the parties settled the second lawsuit, and DentaQuest paid Snodgrass the reimbursements that it withheld without admitting liability. (Doc. No. 400 at 151, 248; Ex. 33 at 4268.)
4. TennCare Makes Delta Dental its Dental Benefits Manager
In 2010, Delta Dental became the Dental Benefits Manager for the TennCare network.
*854 (Doc. No. 400 at 93.) Delta Dental admitted all Snodgrass-King providers into the TennCare network except for an orthodontist at the Mount Juliet office who was excluded based on network needs. (Id. at 109, 177, 212-13.) Snodgrass conceded that TennCare did not require Delta Dental to exclude this provider from the network. (Id. at 191.)
On March 17, 2011, Megan Ryczek, an employee at DentaQuest sent an email to another DentaQuest employee, Account Executive Mary Murack, regarding DentaQuest's "critical providers" in the CoverKids network. (Doc. No. 404 at 173-74, 177; Ex. 124.) A DentaQuest employee put Snodgrass on the list as a "critical provider," stating that he is "well connected politically and very vocal." (Ex. 124 at 18375.) It also noted that Snodgrass was "not a supporter of [DentaQuest]." (Doc. No. 404 at 178; Ex. 124 at 18375.)
5. DentaQuest's Internal Preparation for the 2013 TennCare Request for Proposal
At some point in 2012, Blackwell, who is now Vice President of the Florida Market, and Senior Vice President for Market Development Robert Lynn met with Gillcrist and Long at the TennCare office.[4] (Doc. No. 404 at 182-84.) Blackwell was the only person who attended the meeting that testified at trial. TennCare also shared with Blackwell and Lynn that TennCare did not intend to renew its contract with Delta Dental. (Id. at 185.) She testified that they discussed that TennCare anticipated issuing in 2013 a Request for Proposal, an invitation to apply to be the Dental Benefits Manager for TennCare. (Id. at 184.) They discussed the type of arrangement TennCare and DentaQuest might want if DentaQuest won the contract. (Id. ) Specifically, Blackwell explained that TennCare wanted its Dental Benefits Manager to agree to either a risk-based or some type of risk-share arrangement, in which TennCare and the Dental Benefits Manager would share in the profits and the losses. (Id. at 185, 227.) Blackwell testified that winning the contract was important to DentaQuest. (Id. at 186.)
In December 2012, DentaQuest began preparing for TennCare's 2013 Request for Proposal. (Doc. No. 449-2 at 9.) Blackwell testified that at some point in late-2012, TennCare's Procurement Office sent its Request of Proposal to DentaQuest Sales Director Mark Sniegocki. (Doc. No. 404 at 180.) On December 5, 2012, DentaQuest's Regional Director for Provider Relations Barry Major sent an internal email to DentaQuest's in-house counsel Ronald Price, Vice President for Regional Networks Cheryl Polmatier, and others that was titled "FW: Snodgrass Provider Agreements." (Doc. No. 449-2 at 14; Ex. 37.) The email had a document attached with the then-current contract in place between Delta Dental and the Snodgrass-King providers. (Doc. No. 449-2 at 14.) That same day, Director and Associate Counsel Ronald Price forwarded to Vice President and Deputy General Counsel Hawkins and Lynn a 2009 email chain regarding the 2009 settlement agreement between Doral and Snodgrass-King that resulted in Snodgrass-King's readmission in the dental network. (Id. at 15-16.)
On December 20, 2012, Polmatier responded to an internal email from Blackwell, DentaQuest employee Kimberly Johnson, and Sniegocki, stating that they needed to have an "internal discussion *855 based upon the concerns that Todd [Cruse], Mark [Sniegocki], and Bob [Lynn] shared about the State's position on large groups, Snodgrass and others that we need to 'keep out' of the network." (Id. at 20; Doc. No. 403 at 81; Ex. 39 at 5910.) On December 27, Polmatier sent another internal email to Sniegocki, Lynn, and Cruse sharing some information about the potential Tennessee network. (Doc. No. 449-2 at 21; Doc. No. 404 at 61; Doc. No. 403 at 87; Ex. 42.) In the email, Polmatier stated that it was her understanding that "there are certain providers and large provider groups" that TennCare would prefer DentaQuest not include in its network, and asked for a list of those providers. (Ex. 42 at 3418.) In that context, she stated: "Let me know who knows which offices (besides Snodgrass), and from there we can reach out to Ron Price and understand the position we need to take in communication regarding our network build for Tenn[C]are." (Id. at 3418.) On January 17, 2013, Blackwell responded that nobody knew of any specific providers that TennCare did not want in its network, but that TennCare would send a list of providers with significant utilization review issues and the vendor should take that into account. (Doc. No. 404 at 63; Ex. 2 at 6160.)
On January 2, 2013, Cruse sent an email to Lynn, copying Pollock, ensuring that DentaQuest is working on its proposed network in response to the anticipated Request for Proposal. (Doc. No. 449-2 at 17; Ex. 40.) In that context, he stated that Ron Price had sent him the 2009 Snodgrass settlement agreement to ensure that DentaQuest did not encounter any "problems with his settlement language." (Doc. No. 449-2 at 18; Ex. 40 at 25934.)
On January 8, 2013, Polmatier sent an email to Lynn, Sniegocki, and Price regarding a strategy that DentaQuest was considering to form its TennCare network. (Doc. No. 449-2 at 22-23; Doc. No. 403 at 91; Ex. 41.) Hawkins testified that the strategy utilized the CoverKids contracts as the base for the TennCare program. (Doc. No. 449-2 at 23.) Polmatier wrote that if DentaQuest "wanted to amend any CoverKids provider, with the exception of Snodgrass (33 providers)," it would amend approximately 720 providers to participate in TennCare. (Id.; Ex. 41 at 26757.) She added that if DentaQuest was going to "amend the entire [CoverKids] network, everyone but Snodgrass," it would not hurt if DentaQuest started doing so immediately. (Doc. No. 449-2 at 25; Doc. No. 403 at 91; Ex. 41 at 26757.)
Later, Polmatier sent a follow-up email to the same people stating that DentaQuest did not "know who the other providers are specifically that the State is not interested in." (Doc. No. 449-2 at 24; Ex. 41 at 26755.) She stated that DentaQuest knew that TennCare did not like working with "mobile units [or] large group practices." (Doc. No. 449-2 at 24; Ex. 41 at 26755.) She advised that DentaQuest may want to "await the analysis and any further information from the state/Gilcrest (sic) on who [TennCare does not] want to work with." (Doc. No. 449-2 at 24; Ex. 41 at 26756.) Ultimately, DentaQuest chose to bid on TennCare's 2013 Request for Proposal using DentaQuest USA Insurance Company, Inc. (Doc. No. 449-2 at 23.) Polmatier testified that, as of January 2013, she had decided that if DentaQuest won the TennCare contract, she did not want Snodgrass to participate in its network. (Doc. No. 403 at 58.)
On January 12, 2013, Snodgrass wrote an email to Senator Jack Johnson, his state senator in Williamson County. (Doc. No. 400 at 214; Ex. 1.) In the email, Snodgrass complained about the "TennDent (Delta Dental) Group Practice/Multiple Office Provider Credentialing Criteria." (Doc.
*856 No. 400 at 216; Ex. 1.) Snodgrass believed that Delta Dental's Multiple Office Provider Credentialing Criteria violated his First Amendment rights. (Doc. No. 400 at 217; Ex. 1.)
On January 24, 2013, DentaQuest's Regional Director for Provider Relations Barry Major sent Polmatier an email with a draft of network plans for certain states, including Tennessee. (Doc. No. 403 at 71-72; Ex. 4.) For Tennessee, Major wrote that a network goal was to win the TennCare contract. (Doc. No. 403 at 72; Ex. 4 at 5381.) Another network goal was to amend or re-contract a "right-sized network for TennCare." (Doc. No. 403 at 72-73; Ex. 4 at 5381.) As part of amending the TennCare network, Major wrote that a goal was to "[k]eep Dr. Snodgrass out of the network." (Doc. No. 403 at 73; Ex. 4 at 5381.) Major testified that this was just his draft of network goals and Polmatier had not agreed to them yet. (Doc. No. 404 at 64.) He testified that he wanted to keep Snodgrass out of the network because Snodgrass was in an altercation with his friend from DentaQuest, Kevin Miller, two years earlier. (Id. at 70.) While Major did not identify any other Tennessee providers DentaQuest wanted to exclude in this document, Polmatier testified that DentaQuest was not familiar with most Tennessee providers yet. (Doc. No. 403 at 74.) Instead, Polmatier was familiar with Snodgrass based on his history with DentaQuest and she knew that Snodgrass-King was a large practice, and TennCare had a preference not to contract with large practice groups. (Id. at 74-75.) She further testified that DentaQuest "certainly want[ed] to make the State happy, but ultimately [the decision to invite providers into the network came] down to access of care." (Id. at 75.) In the final draft of the network goals, Polmatier did not include the proposed goal to exclude Snodgrass because she did not feel it was appropriate. (Doc. No. 404 at 73.)
6. TennCare's 2013 Request for Proposal
On February 1, 2013, TennCare officially released its Request for Proposal. (Doc. No. 403 at 25-26.) On February 5, 2013, Polmatier sent an email to her superior Vicki Coats and Senior Vice President and Chief Dental Officer John Luther, Coats' superior. (Id. at 77; Ex. 5 at 3141.) That email detailed how Doral lost the TennCare contract to Delta Dental in 2010, possibly because of price. (Ex. 5 at 3141.) The email also explained that the State is "very unhappy with Delta-said that they let anyone in the network and do not manage the network." (Id. ) Polmatier also described Snodgrass as a "problem provider." (Id.; Doc. No. 403 at 79.) She did so because Snodgrass had previously sued DentaQuest "to participate with Tenn[C]are and CoverKids, and he participates with CoverKids today." (Doc. No. 403 at 79; Ex. 5 at 3141.)
On February 13, 2013, Polmatier sent an internal email to Sniegocki, Lynn, Blackwell, Cruse, Major, and two other DentaQuest management employees, asking for help identifying who the "key players/associations" were in Tennessee. (Doc. No. 403 at 69-70; Ex. 44 at 767.) Attached to the email was a PowerPoint presentation that an employee made for Major regarding its strategy for Tennessee. (Doc. No. 404 at 74; Ex. 634.) On the summary page, the PowerPoint presentation read that "[a]ccording to the State's dental director, the [Request for Proposal] winner will be largely based on a carefully selected network." (Doc. No. 404 at 77; Ex. 634 at 4893.) Major testified that TennCare required submission of the proposed network before awarding the contract to a particular dental benefits manager, rather than *857 the normal process of selecting a dental benefits manager who then creates the network. (Doc. No. 404 at 78-79.) The PowerPoint presentation included the six "large provider groups" in Tennessee, one of which is Snodgrass-King. (Id. at 81; Ex. 634 at 4906.)
On April 2, 2013, DentaQuest submitted its response to TennCare's Request for Proposal. (Doc. No. 403 at 102; Doc. No. 449-1 at 14; Ex. 9.) In that document, it stated that it was "pleased to share that a number of individuals who played significant roles in the success of the TennCare program from 2002-2010 are still with [DentaQuest] and are part of [its] proposed staff." (Doc. No. 449-1 at 14; Ex. 9 at 546.) DentaQuest planned to build its network by "establishing the provider panel from our existing CoverKids network, which includes many dentists from [DentaQuest's] original TennCare network." (Doc. No. 403 at 103; Ex. 9 at 565.) Once DentaQuest had identified those providers, it would "send them an amendment to their contract." (Doc. No. 403 at 103; Ex. 9 at 565.)
7. TennCare's Decision on the 2013 Request for Proposal
On May 1, 2013, TennCare named DentaQuest as its Dental Benefits Manager. (Doc. No. 403 at 26.) As part of the contract, TennCare allowed DentaQuest to credential one location of a provider with multiple service locations. (Id. at 99; Ex. 22 at 29.) If DentaQuest wanted to credential more than one location, the contract required it to visit the other locations and obtain a waiver from TennCare to allow the other locations to be included in the network.[5] (Doc. No. 403 at 99; Ex. 22 at 29.) At some point later in the process, Gillcrist waived the site visit requirement.[6] (Doc. No. 403 at 100.)
On May 3, 2013, Major sent an email to Polmatier with a proposal on how to handle cases where analytics recommended to exclude only a subset of providers at a particular location. (Doc. No. 403 at 95-96; Ex. 45 at 7108.) His proposal would rank locations in four tiers based on utilization review data. (Ex. 45 at 7108.) DentaQuest would allow a location in the network if less than fifty percent of the billing from the location came from tier four providers. (Id. ) Major identified one problem with his method: that DentaQuest would "have to figure out a way to justify excluding Snodgrass due to the fact that he would be allowed to stay in the network using this criteria." (Id.; Doc. No. 403 at 96.) Major suggested DentaQuest may be able to decrease the percentage of billing from tier four providers at each location to forty percent, but that may create access problems with fewer providers in the network. (Doc. No. 403 at 96; Ex. 45 at 7108.) If it chose not to decrease the percentage, Major noted that DentaQuest "may need to get a little more creative [to justify excluding Snodgrass]." (Doc. No. 403 at 97; Ex. 45 at 7108.) Major testified that ultimately DentaQuest did not use this proposal, but instead it excluded locations that included exclusively tier four providers. (Doc. No. 404 at 18-19.)
*858 On May 17, 2013, TennCare held a "Kickoff Meeting with DentaQuest." (Doc. No. 403 at 35; Ex. 46 at 6297.) Pollock, now DentaQuest's Chief Operating Officer, and Bostrack, now DentaQuest's Regional Vice President for Sales and Client Services, attended this meeting on behalf of DentaQuest. (Ex. 46 at 6297.) No testimony suggested that Snodgrass-King was mentioned at this Kickoff Meeting. On May 20, 2013, DentaQuest's Chief Analytics Officer Saju Puthussery sent an email to Polmatier and her counterpart, Ken Hammer, regarding information learned at the Kickoff Meeting. (Id. at 6295; Doc. No. 403 at 35.) Puthussery informed Polmatier and Hammer that the State would be sending the utilization data for the past three years, when Delta Dental was the Dental Benefits Manager. (Doc. No. 403 at 38; Ex. 46 at 6295.) DentaQuest could use that data in gathering information on the Tennessee providers to build its network. (Doc. No. 403 at 37.) DentaQuest's "Network Provider Methodology and Process" document stated that it would select providers to be included in the TennCare network based on four "performance variables": provider tier, statistical outlier test results, claim review clinical denial rates, and dental record audit results. (Id. at 39-40; Ex. 8 at 4890-91.)
All Snodgrass-King providers applied to be part of the TennCare network. (Doc. No. 400 at 177.) On July 26, 2013, DentaQuest, through Major, sent a letter to all providers in Tennessee, including Snodgrass-King providers, describing how DentaQuest will determine a provider's eligibility to be a TennCare provider. (Id. at 178-179; Doc. No. 403 at 40-41; Ex. 50 at 5640.) This criteria included a "peer-review selection process and criteria," which matched the four "performance variables" in DentaQuest's "Network Provider Methodology and Process" document. (Doc. No. 403 at 41; Ex. 50 at 5640.) It did not include a criterion for the number of offices any provider may have. (Doc. No. 403 at 42.) On September 4, 2013, DentaQuest, through Major, sent a letter to all providers, including Snodgrass-King's providers, reminding them that "DentaQuest will extend an invitation to contract to eligible dentists who: (a) [a]re re-evaluated by the state of Tennessee; (b) [h]ave been successfully credentialed by DentaQuest; and (c) [s]atisfy the ... peer reviewed selection process and criteria." (Id. at 49; Doc. No. 400 at 180; Ex. 51 at 2929.) The "peer reviewed selection process and criteria" were the same criteria listed in the July 26, 2013 letter.[7] (Ex. 51 at 2929.) The formation of the network "relies on close collaboration between providers, TennCare, and DentaQuest." (Id.; Doc. No. 403 at 49-50.)
That summer, TennCare sent DentaQuest the "pool of providers" that TennCare credentialed, which are the providers that it permitted DentaQuest to include in its network. (Doc. No. 404 at 22.) All Snodgrass-King providers were successfully credentialed by the State. (Doc. No. 403 at 48.) Around this time, DentaQuest created what it referred to as its "large provider rule." (Id. at 31.) Under this rule, DentaQuest would exclude any "large provider," which it defined as a provider with more than three offices, unless there was an access need in the county. (Doc. No. 403 at 60.)
On September 19, 2013, Major sent an email to Polmatier and DentaQuest employee Shawn Massey, titled "TennCare Network Selections." (Doc. No. 404 at 88;
*859 Ex. 70.) This email explained DentaQuest's process in inviting or rejecting providers from its network. (Doc. No. 404 at 89.) The spreadsheet showed that many Snodgrass-King providers were excluded because they were "affiliated with [a] secondary network exclusion," meaning that they ran afoul of DentaQuest's large provider rule. (Ex. 70.) Other Snodgrass-King providers were excluded because they were part of a large provider practice group. (Id.; Doc. No. 404 at 117.) Major's email suggested that DentaQuest would consider letting many of the Snodgrass-King providers in DentaQuest's network if they worked at a different location. (Ex. 70 at 4700.) DentaQuest did not put Snodgrass-King providers in the category of individuals and entities that were prohibited from joining the network because they had utilization review problems. (Id. )
8. DentaQuest Excludes Snodgrass-King Providers
On October 1, 2013, DentaQuest began managing the TennCare dental network. (Doc. No. 403 at 26.) On December 12, 2013, Jason Keen, the Chief Operating Officer and Chief Financial Officer at Snodgrass-King, sent an email to Ann Mallin, an employee at DentaQuest, asking for an update on Snodgrass-King's status "with respect to credentialing." (Doc. No. 449-2 at 27; Doc. No. 404 at 38; Ex. 48 at 25876.) Mallin forwarded this email to Major, who forwarded it to Cruse, Price, DentaQuest's outside counsel Bill West, and Polmatier. (Doc. No. 449-2 at 28; Ex. 48 at 25875-76.) Major then forwarded the email to DentaQuest's Senior Vice President and General Counsel David Abelman. (Doc. No. 449-2 at 28; Ex. 48 at 25874-5.) On December 16, 2013, Snodgrass-King's providers received a letter from DentaQuest, through Major, terminating Snodgrass-King's participation in the network without cause.[8] (Doc. No. 400 at 138, 182-83; Ex. 67 at 5670.)
On January 3, 2014, Snodgrass-King, through its attorneys, wrote a letter to Major at DentaQuest requesting that DentaQuest reconsider its decision to exclude Snodgrass-King from the TennCare network or explain why DentaQuest excluded Snodgrass-King from the network. (Doc. No. 400 at 184; Ex. 60.) On January 14, 2014, the attorney for DentaQuest responded to Snodgrass-King's inquiries by declining its "request for a reconsideration and reversal of its decision not to invite [Snodgrass-King] to participate in its TennCare network." (Ex. 61 at 5725.) DentaQuest explained that its network included approximately 140 providers in Davidson County, thirty-four in Williamson County, forty-four in Rutherford County, seventeen in Wilson County, and twenty-two in Maury County. (Id. at 5725-26.) "As a consequence of this extensive and widely distributed network, the services of Snodgrass-King were not included in the DentaQuest TennCare network." (Id. at 5726.)
DentaQuest admitted that "the only reason that DentaQuest has given for not including a single Snodgrass-King provider in its DentaQuest network is: 'the offices were set aside due to the fact that they were a large entity provider entity with multiple locations in an area projected to exceed access targets.' " (Doc. No. 403 at 47.) DentaQuest also admitted that its decision "not to include Snodgrass-King providers in the DentaQuest network in 2013 was not based upon an evaluation of the quality or efficiency of care provided by Snodgrass-King providers." (Doc. No. 406 at 80.) Snodgrass-King's providers are the only providers that practiced dentistry *860 in Tennessee that DentaQuest set aside because of its "large provider rule." (Doc. No. 403 at 51-52, 120-22; Ex. 23.) Polmatier testified that the other large providers were invited in the network because they had oral surgeons, which are difficult to find in Medicaid, and Snodgrass-King did not have one listed.[9] (Doc. No. 403 at 121.) Major testified that he learned that Snodgrass-King was the only provider group excluded under the Large Provider Rule only after Snodgrass filed the instant lawsuit. (Doc. No. 404 at 121.)
Polmatier also testified that DentaQuest excluded the Snodgrass-King providers because they had utilization review problems. (Doc. No. 403 at 63.) She testified that utilization review identifies "outliers," meaning "dentists that fall outside how their peers practice." (Id. ) Those outliers are "flagged" for utilization review and then investigated by DentaQuest's auditors. (Id. ) Polmatier explained that DentaQuest had "flagged" at least one of the Snodgrass-King providers for utilization review problems, but that she did not know which provider that DentaQuest flagged or whether DentaQuest flagged Snodgrass or King. (Id. at 68-69.)
9. Expert Proof at Trial
Christopher Lovin, C.P.A., A.B.V., C.F.F., C.F.E., a partner in the valuation and litigation support services division of the accounting firm Lattimore Black Morgan & Cain, P.C., testified on behalf of Snodgrass-King regarding whether DentaQuest should have excluded all Snodgrass-King's providers using DentaQuest's criteria. (Id. at 133.) After reviewing the selection methodology and process that DentaQuest used and using the data DentaQuest provided, Lovin concluded that the data did not support exclusion of any Snodgrass-King location from the TennCare network. (Id. at 133-34.) He reasoned that DentaQuest created four tiers of providers in each county in Tennessee, ranging from the highest quality and efficiency to the lowest quality and efficiency. (Id. at 140.) If all of a location's providers were in the fourth tier, they would be excluded from the network. (Id. at 141.) Approximately eight percent of Snodgrass-King providers were fourth tier providers, with the average Snodgrass-King provider falling in tier two. (Id. at 143, 157.) DentaQuest rated all providers with similar utilization scores as Snodgrass-King as tier two. (Id. at 159.)
Lovin also analyzed outliers in utilization, as DentaQuest did in creating its network, and he found that none of the Snodgrass-King providers were outliers. (Id. at 147-48.) DentaQuest also looked at percentage of claims denied, and Snodgrass-King had eight percent of its claims denied, while the average was 15.5 percent. (Id. at 150-51.) Lovin also noted that DentaQuest disputed one provider's claims of about $5,995.00, but did not see that as a reason to exclude that provider because other providers in the same county had higher disputed amounts, up to $298,000, and were not considered to be excluded. (Id. at 153.) Lovin agreed that data on these factors was limited, and that he was not sure if DentaQuest used it to make its network inclusion decisions. (Id. at 176.)
Lovin also analyzed DentaQuest's large provider rule. (Id. at 161.) He compared Snodgrass-King with Heartland Dental, a group with four offices in the same counties as Snodgrass-King. (Id. ) Overall, Snodgrass-King had a better performance *861 score than Heartland Dental. (Id. at 162.) Lovin concluded that there was no real reason why Heartland Dental was included in the network and Snodgrass-King was excluded. (Id. ) In reaching this conclusion, Lovin assumed, incorrectly, that Snodgrass-King had an oral surgeon as Heartland Dental did. (Id. at 184.) Based on Lovin's review of DentaQuest's data, the exclusion of Snodgrass-King providers cost DentaQuest $950,000.00 more than it would have paid if it included Snodgrass-King in the network. (Id. at 166.)
B. ANALYSIS
Snodgrass-King's sole claim is that DentaQuest retaliated against it for exercising its First Amendment rights in violation of 42 U.S.C. § 1983. DentaQuest maintains that Snodgrass-King did not present any evidence of state action, nor of retaliation. (Doc. No. 412 at 4-25.) It also moves for judgment as a matter of law on punitive damages. (Id. at 25.) Snodgrass-King counters that it presented sufficient evidence to support the jury verdict. (Doc. No. 433.)
1. Under Color of State Law
To succeed on a claim for a violation of 42 U.S.C. § 1983, a plaintiff must establish that he or she was denied a constitutional right by a person acting under color of state law. Carl v. Muskegon Cty., 763 F.3d 592, 595 (6th Cir. 2014). DentaQuest and its employees are all private actors, generally not subject to liability under § 1983. Lansing v. City of Memphis, 202 F.3d 821, 828 (6th Cir. 2000). A private actor's conduct must equate to "state action" within the meaning of the Fourteenth Amendment to the United States Constitution to satisfy the "under color of state law" requirement. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 934-35, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ). The "First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 749 n.1, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (citing Bigelow v. Virginia, 421 U.S. 809, 811, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) ).
The state action analysis hinges on whether the challenged conduct of the private entity may be fairly attributable to the State. Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (citing Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ). In Blum, one of the first pivotal state action cases decided by the Supreme Court, Medicaid patients challenged a private hospital's determination that they should be transferred to a lower level of care. Id. at 995, 102 S.Ct. 2777. The Supreme Court determined that state action did not exist even though the private hospital's decisions on the Medicaid patients were determined largely by following state regulations. Id. at 1007-11, 102 S.Ct. 2777. The Supreme Court explained that there was not
a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. Jackson v. Metro. Edison Co., 419 U.S. 345, 351 [95 S.Ct. 449, 42 L.Ed.2d 477] (1974). The purpose of this standard is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.... [A]lthough the factual setting of each case [is] significant, ... a State normally can be held responsible for a private decision only *862 when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 166 [98 S.Ct. 1729, 56 L.Ed.2d 185] (1978) ).
Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis in original). The state regulations did not "dictate" the private hospital's decisions, so the Supreme Court held that the private hospital was not a "state actor" for the purposes of § 1983. Id. at 1010, 102 S.Ct. 2777.
"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (quoting Burton v. Wilmington Parking Auth., 365 U.S 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ). A finding of state action is rare; "the frequent reality that the State regulates private entities or cooperates with them does not transform private behavior into state behavior." Thomas v. Nationwide Children's Hosp., 882 F.3d 608, 612, 2018 WL 844672, at *2 (6th Cir. 2018) (citing Jackson, 419 U.S. at 350, 95 S.Ct. 449 ). Courts strive to " 'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on a State for conduct it could not control.' " Brentwood Acad., 531 U.S. at 295, 121 S.Ct. 924. (quoting Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (internal quotations omitted) ).
Although determining what conduct is "fairly attributable is a matter of normative judgment, and the criteria lack simplicity," id., the United States Court of Appeals for the Sixth Circuit has recognized four tests to assist in determining whether private action has a close enough nexus to the State to constitute state action: (1) whether the private entity was serving a traditionally public function (the "public function test"); (2) whether the government coerced or substantially encouraged the action taken by the private entity (the "state compulsion test"); (3) whether the public and private entities have a symbiotic relationship (the "symbiotic relationship or nexus test"); and (4) whether the public and private entities are so entwined that it is fair to apply constitutional standards to the private entity's actions (the "entwinement test"). Marie v. Am. Red Cross, 771 F.3d 344, 362-64 (6th Cir. 2014) ; Lindsey v. Detroit Entm't, LLC, 484 F.3d 824, 828 (6th Cir. 2007) (citation omitted). At trial, the Court instructed the jury on the state compulsion test and the symbiotic relationship or nexus test. (Doc. No. 383 at 34-37.)
Under any of the tests, the first step in deciding whether the private actor's conduct constituted "state action" is to ascertain "the specific conduct of which the plaintiff complains." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting Blum, 457 U.S. at 1004, 102 S.Ct. 2777 ). This stems from the requirement that the state must significantly involve itself with " 'invidious discriminations [or retaliation] ...' in order for the discriminatory [or retaliatory] action to fall within the ambit of the constitutional prohibition." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (quoting Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) ); see Redmond v. The Jockey Club, 244 Fed.Appx. 663, 673-74 (6th Cir. 2007) (Clay, J., concurring) (quoting Bier v. Fleming, 717 F.2d 308, 311 (6th Cir. 1983) (discussing state action) ). Here, the challenged conduct is DentaQuest's 2013 exclusion of *863 Snodgrass-King providers from the TennCare network. See Am. Mfrs. Mut. Ins. Co., 526 U.S. at 51, 119 S.Ct. 977 (finding on a Fourteenth Amendment due process claim that the "specific conduct of which the plaintiff complains" was the private party's decision that the plaintiff is challenging, not the unconstitutional motivation).
a. State Compulsion Test
Under the state compulsion test, to prove that a private actor's conduct constituted state action, the plaintiff must prove that the state exercised "such coercive power or provide[d] such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." Campbell v. PMI Food Equip. Grp., Inc., 509 F.3d 776, 784 (6th Cir. 2007) (quoting Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992) ). "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." Id. (quoting Wolotsky, 960 F.2d at 1335 ). A private party's "free-will choice" does not constitute state action, even if state agents "encouraged" the choice, S.H.A.R.K. v. Metro Parks Serving Summit Cty., 499 F.3d 553, 565 (6th Cir. 2007), "approve[d]" or "incentive[ized]" to the choice, Campbell, 509 F.3d at 784 ; but only if the State acts in such a way to make it responsible for the choice. Blum, 457 U.S. at 1004, 102 S.Ct. 2777. Although the State may incentivize the private party to do certain actions, if it does not "require" the action through its significant encouragement or coercion, the private party's reaction to the State's incentives will not be sufficient to make the private party's choice "deemed to be that of the state." Campbell, 509 F.3d at 784. Because the state action analysis is a fact-based inquiry, it is useful to review the published cases on state action to glean in this case, with the facts taken in light most favorable to Snodgrass-King, fall on the "significant encouragement or coercion" scale.
Campbell held that a state can incentivize certain actions without it being deemed state action. 509 F.3d at 784. After the State offered tax incentives for a manufacturing company to open a plant in Piqua, Ohio, the company closed its Dayton, Ohio plant and moved, firing its Dayton workers. Id. at 779-80. Now without a job, the workers sued, alleging state action because the company closed the Dayton plant to relocate its functions to Piqua, Ohio, where the company received a significant tax abatement designed "to attract new business operations." Id. at 780. The Sixth Circuit found that the level of the state's encouragement was not enough to satisfy the state compulsion test:
There is nothing in the record to show that any of the state entities "exercised such coercive power or provided such encouragement as to make [PMI's] decision state action." PMI, a private company, made a business decision to voluntarily enter into a contract with government entities, to close its Dayton Plant, and to terminate the workers. No state law or any state entity required PMI to take any of those actions. Indeed, the Agreement required only that PMI open a facility in Piqua. It did not require PMI to close facilities elsewhere or lay off existing employees.
Id. at 784 (quoting Wolotsky, 960 F.2d at 1335 ).
Wilcher v. City of Akron, 498 F.3d 516 (6th Cir. 2007), narrowed a finding of state action further. There, Time Warner Cable attempted to promulgate new rules for its public access station, which the City had to approve in order to become effective.
*864 Id. at 518. The Mayor approved the new rules, and a citizen who was affected by those rules brought suit. Id. The court found that Time Warner Cable was not a state actor for the purposes of § 1983 because the plaintiff did not "allege that city officials coerced Time Warner into proposing the new regulations." Id. at 520. To support a finding of state action, the Sixth Circuit held that the plaintiff must "prove that state officials coerced or participated in the company's decision-making to the extent required to trigger state action status." Id. at 520.
Finally, S.H.A.R.K. teaches that encouragement, without more, does not rise to the level of significant encouragement required for a private party's conduct to transform into conduct of the state. 499 F.3d at 565. After Metro Parks contracted with a private party to assist in a planned deer-culling operation, S.H.A.R.K., a nonprofit organization, installed cameras to tape the rangers killing the deer so that it could give the tapes to local news stations. Id. 557-58. Two rangers discovered the cameras and took them down. Id. at 558. The rangers then called the head of the private party assisting with the deer-culling operation to the ranger cabin, told him what was on the tapes, and asked whether he knew how to erase the tapes. Id. The private actor then erased the tapes while the rangers watched without attempting to stop him. Id. The Sixth Circuit found that the private actor "made a free-will choice to erase the images," and to the extent the rangers encouraged him, "this is not the type of significant encouragement that would turn [the private actor's] choice to delete the tapes into that of government action. Id. at 565.
b. Application of the State Compulsion Test
While the historical evidence was helpful background knowledge of the tense relationship between these parties and TennCare, Snodgrass-King correctly aims its argument on state action in the 2012-13 timeframe-when DentaQuest made its decision to exclude Snodgrass-King from the TennCare network. (Doc. No. 433 at 15.) Snodgrass-King identifies three evidentiary bases that overlap upon which it believes a reasonable jury could find state action: (1) a clearly stated directive from TennCare to "keep out" Dr. Snodgrass through Gillcrist or Long; (2) that DentaQuest was motivated by an incentive to win the TennCare contract to become the Dental Benefits Manager; and (3) the "keep out" remark may have been used by TennCare in the context of discussions with DentaQuest about the contract to be the Dental Benefits Manager. (Id. ) DentaQuest responds that "no evidence at trial showed a 'clearly stated directive' from Dr. Gillcrist or corroborated Plaintiffs' theory about the December 2012 meeting, and the remainder of the evidence is legally insufficient to constitute state action (Doc. No. 445 at 7.)
First, there was no clearly stated directive from TennCare to "keep out" Snodgrass-King. The internal email Snodgrass-King relies on, written by Polmatier, who was not at the 2012 meeting with TennCare, says that the sales team shared concerns with her that the State would like DentaQuest to "keep out" Snodgrass-King from the TennCare network. (Ex. 39 at 5910.) This was hardly news-the State and Snodgrass have had a rocky relationship dating back to 2001. This email, however, does not say that the State required or demanded that DentaQuest to "keep out" Snodgrass-King providers in order to win the contract. Rather, it is a DentaQuest internal email discussing DentaQuest's strategy and at most the State's preference to have the best chance of winning *865 the anticipated Request for Proposal. If Snodgrass-King wanted a reasonable jury to believe that this language was the directive from the State, it would need to present some direct or circumstantial evidence to link the "keep out" phrase on other equivalent language to TennCare. The email, when put in context of the entire record, is simply not proof for a reasonable jury to find that the State coerced or significantly encouraged, as precedent requires, DentaQuest's 2013 decision. Indeed, in the context of all the proof at trial, in the light most favorable to Snodgrass-King, the email only states TennCare's preference regarding Snodgrass-King, which has been known by the parties since at least 2001. While DentaQuest wanted to make the State happy, the State telling DentaQuest its preferences or hope or desire in advance of the Request for Proposal does not, without more, permit the conclusion that TennCare is responsible for DentaQuest's actions.
The other two evidentiary basis Snodgrass-King claims supports a finding of state action are also not sufficient. The Sixth Circuit already held that incentives from the state are insufficient to "significantly encourage or coerce" private action. Campbell, 509 F.3d at 784. And Campbell, Wilcher, and S.H.A.R.K. all involved contracts with the state that would likely expire, so the private actor would have incentive to keep the state actors satisfied. Ultimately, a reasonable jury could not find that the State so significantly encouraged or coerced DentaQuest's decision to make it fairly attributable to the State.
At oral argument, Snodgrass-King argued that the historical background information, the December 27, 2012 (Ex. 42) and January 8, 2013 emails (Ex. 41), and that Snodgrass-King was the only large provider dental group excluded under DentaQuest's "large provider rule" also suggested that the State coerced or significantly encouraged DentaQuest to exclude Snodgrass-King. These, however, only suggest the State's involvement when read in conjunction with the December 20, 2012 "keep out" email. DentaQuest would have the jury speculate that because the State was angry in 2009 when Doral allowed Snodgrass-King in the TennCare network, the State then terminated Doral as its Dental Benefits Manager, hired Delta Dental, and then terminated Delta Dental as the Dental Benefits Manager when it also allowed Snodgrass-King in its network. Snodgrass-King then would have the jury believe that the State told DentaQuest to "keep out" Snodgrass-King providers from the TennCare network and it would win the contract. It then sent multiple emails indicating the State preferred having Snodgrass-King out of the network, and the final decision was made as to Snodgrass-King providers in January 2013.
The main issue with Snodgrass-King's theory is that there is no evidence to support it. Even assuming the State terminated DentaQuest as the Dental Benefits Manager in 2010 because it allowed Snodgrass-King in the network-which seems far-fetched-it would seem that the State would then coerce or significantly encourage Delta Dental to exclude Snodgrass-King from the TennCare network. That did not happen. There is no evidence as to why the State terminated Delta Dental as its Dental Benefits Manager other than it was not "managing the network" to the State's liking. And while it is true that the only name that appears on any of DentaQuest's internal emails is Snodgrass' name, and it is possible that someone from the State told DentaQuest its "preference" or "position" to exclude Snodgrass-King from the network, it is undisputed that DentaQuest made the final decision on which providers were allowed in the network in *866 October 2013. There is no evidence that TennCare significantly encouraged or coerced this result.
Snodgrass-King's persuasive authority does not require, a different result. In Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589 (3d Cir. 1979), the private horse racing track expelled a horse from its stables for violation a Racing Commission Rule. The Third Circuit held that the private track was operating as an arm of the State because it was using its delegated authority from the State to enforce state regulations. Id. at 597. Key to the decision was that the officials from the Racing Commission "personally and actively participated in the specific conduct challenged by Fitzgerald." Id. Here, DentaQuest was not enforcing a state regulation when it decided in 2013 to exclude Snodgrass-King from the TennCare network. Rather, it was responsible for creating a network that could serve the TennCare population based on access needs. No state official told DentaQuest that Snodgrass-King was violating one of its rules, although DentaQuest did create a "large provider rule" because it believed the State had a preference against large providers. Overall, the facts are too dissimilar for Fitzgerald to carry much weight in the Court's decision.[10]
On the other hand, the cases in which private actor excludes a person or takes an action, such as DentaQuest's 2013 exclusion of Snodgrass-King from the TennCare network, are more informative. Blum , Campbell , Wilcher , and even Fitzgerald all involved allegations that the state was involved in or coerced the exclusion of a person by a private actor. In those cases, the State had to be intimately involved in the final decision in order to constitute state action, such as in Fitzgerald where the private actor was behaving as an "arm of the state." Proof that the State "approved," "acquiesced," "encouraged," or even "incentivized" the exclusion of the plaintiff was not enough. When combined with S.H.A.R.K. , where the State officials called the private actor to their ranger station, showed them the damning tape, and watched the private actor erase the tape, the facts indicate that the State's encouragement of DentaQuest's 2013 decision did not reach the level of significant encouragement required under precedent. TennCare officials told DentaQuest that TennCare was going to release a Request for Proposal, DentaQuest then kept Snodgrass-King out of the network while TennCare officials watched, and TennCare awarded DentaQuest the contract.
A reasonable jury might conclude that TennCare "approved," "acquiesced," "encouraged," or even "incentivized" DentaQuest's 2013 exclusion of Snodgrass-King from the TennCare network. But this is not legally sufficient to constitute State action. Accordingly, DentaQuest is entitled to judgment as a matter of law.
2. Close Nexus Test
The Court also charged the jury on the close nexus or symbiotic relationship test. (Doc. No. 383 at 36-37.) "Under the symbiotic [relationship] or nexus test, a [§] 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." Chapman v. Higbee Co., 319 F.3d 825, 834 (6th Cir. 2003) (en banc) (citing *867 Wolotsky, 960 F.2d at 1335 ). The plaintiff must demonstrate that "the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state." Wolotsky, 960 F.2d at 1335 (citing Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ). The inquiry is "fact-specific, and the presence of state action is determined on a case-by-case basis." Chapman, 319 F.3d at 834 (citing Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ).
Here, there is no evidence that TennCare was "intimately involved" in DentaQuest's decision to exclude Snodgrass-King providers from the TennCare network in 2013. Rather, the only evidence, at most, shows that TennCare had a preference to exclude Snodgrass-King, that TennCare may have told DentaQuest its preference, and that DentaQuest decided to act on TennCare preferences. However, there is no proof of any close interaction between the State and DentaQuest regarding the exclusion of Snodgrass-King from the TennCare network after the mid-to late-2012 meeting. There is not a "sufficiently close nexus" so that TennCare is responsible for DentaQuest's conduct. No reasonable jury could conclude that the TennCare and DentaQuest had a symbiotic relationship when the DentaQuest excluded Snodgrass-King providers from the TennCare network in 2013. The motion for judgment as a matter of law will be granted on this basis as well.
II. MOTION FOR A NEW TRIAL
Pursuant to Federal Rule of Civil Procedure 50(c), if the Court grants a motion for judgment as a matter of law, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." DentaQuest moves for a new trial for six reasons: (1) the jury's verdict was against the great weight of the evidence; (2) the jury instructions contained errors requiring a new trial; (3) the jury relied on speculative evidence in awarding Snodgrass-King $7.4 million in compensatory damages; (4) Snodgrass-King's attorneys continually violated Court orders and introduced irrelevant evidence at trial; (5) the punitive damages award is excessive; and (6) the Court erred on certain evidentiary rulings. (Doc. No. 414.)
Federal Rule of Civil Procedure 59(a)(1)(A) allows a court to grant a new trial on some or all of the issues after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Generally, a district court should grant a motion for a new trial only "when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Mosby-Meachem v. Memphis Light, Gas & Water Div., 883 F.3d 595, 606, 2018 WL 988895, at *7 (6th Cir. Feb. 21, 2018) (quoting Holmes v. City of Massillon, Oh., 78 F.3d 1041, 1045-46 (6th Cir. 1996) ). The burden of demonstrating the necessity of a new trial is on the moving party. The ultimate decision of whether to grant such relief is a matter vested within the sound discretion of the district court. Clarksville-Montgomery Cty. Sch. Sys. v. U.S. Gypsum Co., 925 F.2d 993, 1002 (6th Cir. 1991).
A. WEIGHT OF THE EVIDENCE
DentaQuest first argues that the weight of the evidence did not support the jury verdict, incorporating its argument from the Motion for Judgment as a Matter of Law. (Id. at 7-8.) "If, having given full *868 respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that the judge will grant a new trial." C. Wright & A. Miller, 11 Federal Practice and Procedure § 2806, at 93 (3d ed. 2012). If the Sixth Circuit decides that Snodgrass-King produced sufficient evidence of state action, the jury's decision was not otherwise against the clear weight of the evidence.
DentaQuest argues that the jury's finding that Snodgrass-King established a First Amendment violation is against the clear weight of the evidence. (Doc. No. 414 at 8 (referring to Doc. No. 412 at 19) ). Specifically, DentaQuest argues that Snodgrass-King did not present any proof that DentaQuest's 2013 decision to exclude Snodgrass-King from the TennCare network in 2013 was motivated at least in part by Snodgrass-King's protected conduct. (Id. ) Snodgrass-King argues that DentaQuest is not reading the facts in the light most favorable to the jury verdict. (Doc. No. 433 at 19.)
To prevail on a First Amendment retaliation claim, a plaintiff must prove: (1) the plaintiff engaged in constitutionally protected conduct; (2) the defendant took an adverse action against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the plaintiff's protected conduct motivated the defendant's adverse action at least in part. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012) (citing Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005) ).
If there is state action in this record, Snodgrass-King presented sufficient circumstantial evidence for a jury to infer and conclude that DentaQuest's 2013 decision to exclude all Snodgrass-King providers from the TennCare network was motivated at least in part by Snodgrass' prior lawsuits and opposing DentaQuest as TennCare's Dental Benefits Manager. The Court instructed the jury that it must find causation to return a verdict for Snodgrass-King. (Doc. No. 383 at 38-39, 42-44.) After viewing the facts in the light most favorable to Snodgrass-King, the jury's decision on First Amendment retaliation was not against the great weight of the evidence.
B. JURY INSTRUCTIONS
DentaQuest argues that errors in the jury instructions require the Court to grant a new trial. (Id. at 8.) The relevant question is whether the jury instructions, taken as a whole, "adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." E.E.O.C. v. New Breed Logistics, 783 F.3d 1057, 1074 (6th Cir. 2015) (quoting Pivnick v. White, Getgey & Meyer Co., LPA, 552 F.3d 479, 488 (6th Cir. 2009) ). A district court should grant a new trial for erroneous jury instructions only "if they are confusing, misleading, and prejudicial." Id. (citing Pivnick, 552 F.3d at 488 ). A district court should not grant a new trial for an erroneous jury instruction "where the error is harmless." Id. at 1074-75 (citing Pivnick, 552 F.3d at 488 ).
First, DentaQuest argues that the jury instruction regarding state action (Doc. No. 383 at 34-37) was erroneous because it defined the "challenged action" as "DentaQuest USA's 2013 decision not to invite Snodgrass-King into the TennCare network." (Id. at 36-37.) DentaQuest believes that the challenged action includes the retaliatory motive, i.e., opposition to Snodgrass-King's protected First Amendment activity. (Doc. No. 414 at 8-9.) As discussed in the Judgment as a Matter of Law section of this Memorandum Opinion, *869 the unconstitutional motivation is not relevant to the challenged action analysis.[11] Therefore, the Court properly instructed the jury on state action.
Second, DentaQuest argues that the jury instruction regarding the "motivating factor" element of the First Amendment retaliation claim (Doc. No. 383 at 42) was erroneous because it did not require Snodgrass-King to prove that TennCare's motivating factor in coercing DentaQuest into excluding Snodgrass-King from the TennCare network was Snodgrass-King's protected First Amendment activity. (Doc. No. 414 at 10.) To prevail on a First Amendment retaliation claim, a plaintiff must prove: (1) the plaintiff engaged in constitutionally protected conduct; (2) the defendant took an adverse action against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the plaintiff's protected conduct motivated the defendant's adverse action at least in part. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012) (citing Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005) ). Had Snodgrass-King proven state action, then DentaQuest would have become an arm of the State, and its retaliatory motive would have been the State's retaliatory motive. Because the Court explicitly required the jury to find that DentaQuest was a state actor prior to making a finding on First Amendment retaliation, the jury instructions did not error.
Third, DentaQuest challenges the jury instruction regarding whether to award punitive damages. (Doc. No. 414 at 10 (citing Doc. No. 383 at 55) ). DentaQuest argues the Court's jury instruction should have required Snodgrass-King to prove that DentaQuest acted with "evil motive or intent, or that [DentaQuest's actions] involve[ ] reckless or callous indifference to the federally protected rights of [Snodgrass-King]." (Id. at 10-11 (quoting King v. Zamiara, 788 F.3d 207, 216 (6th Cir. 2015) ) ). While the Court's jury instruction requiring a factual finding that DentaQuest acted "intentionally, recklessly, or maliciously" may differ in form from DentaQuest's proposed instructions, the Court finds no substantive difference.
"[E]vil motive or intent" requires "at a minimum ... recklessness in its subjective form." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Malice is also interchangeable with "evil motive or intent." See Kolstad, 527 U.S. at 548 n.2, 119 S.Ct. 2118 (1999). Therefore, the jury is permitted to find that Snodgrass-King was entitled to punitive damages based on a finding that DentaQuest acted "intentionally, recklessly, or maliciously." Insofar as the Court's chosen language differs from the traditional formulation cited by DentaQuest, any difference was harmless.
Last, DentaQuest argues, without authority, that the Court's verdict form was "over-simplistic" and did not ensure that "the jury read, understood, deliberated and resolved each element of the claim." (Doc. No. 414 at 11.) The decision on whether to use a general verdict form or a specific verdict form is within the "sound discretion of the trial court." Workman v. Frito-Lay, Inc., 165 F.3d 460, 465 (6th Cir. 1999). DentaQuest presents no *870 authority dictating that the Court abused its discretion in using a general verdict form on a single-claim case where it instructed the jury that it must first find state action in order to find for the plaintiff.
C. COMPENSATORY DAMAGES
DentaQuest argues that the compensatory damage award was based on speculation and is excessive. (Doc. No. 414 at 11.) It argues, as it argued to the jury at trial, that the largest damage award supported by the evidence is $448,698 per year, which was 25% of Snodgrass-King's operating income for 2013. (Doc. No. 414 at 12.) However, it argues that any award would be based on pure speculation, and the jury should have awarded nominal damages if it were to find in Snodgrass-King's favor on liability. (Doc. No. 414 at 12-13; Doc. No. 412 at 27.) The proof at trial permitted the jury to find otherwise.
As a result of being excluded from the TennCare network, approximately 20,000 TennCare patients had to stop using Snodgrass-King. (Doc. No. 400 at 82, 286-87.) Snodgrass estimated that about thirty percent of his practice constituted TennCare patients. (Id. at 199.) Snodgrass-King's Hermitage office was forced to reduce its hours from four-and-a-half days per week to one day per week. (Id. at 82.)
From 2011 to 2012, Snodgrass-King's operating income decreased from $3,022,196.78 to $2,226,471.17. (Id. at 264; Ex. 703 at 9558.) Snodgrass testified that at that time he only recently opened his Mt. Juliet office, which is why Snodgrass-King lost so much operating income. (Doc. No. 400 at 264.) However, he admitted that the Hermitage office lost $568,000.00 over the same period. (Id. at 265.) From 2012 to 2013, Snodgrass-King's operating income decreased again to $1,794,792.93, (Id. at 266; Ex. 704 at 9679.) Snodgrass testified that this was because he had "more staff, more doctors, more expenses" with the new Mt. Juliet office. (Doc. No. 400 at 266.)
Snodgrass-King presented Jerry W. Faulkner, C.P.A., to testify on damages. (Doc. No. 404 at 239.) Faulkner does accounting and audit and income tax, consulting, and litigation support at the accounting firm of Faulkner, Mackie & Cochran. (Id. at 241-42.) In October 2016, Faulkner conducted a lost profits calculation for Snodgrass-King for the years 2014 to 2018 because DentaQuest's TennCare contract lasted three years and had two one-year renewal options. (Id. at 245, 247.) He estimated that Snodgrass-King's lost TennCare operating profits, minus the avoided costs that the company did not have to incur, constituted $1.855 million for the twelve-month period ending December 1, 2014. (Id. at 247.) For the following year, Faulkner estimated that Snodgrass-King's lost revenue profits constituted $2.18 million. (Id. at 248.) For the nine month period ending September 30, 2016, Faulkner estimated Snodgrass-King's lost operating profits were $1.402 million. (Id. ) If TennCare extended DentaQuest's contract to September 30, 2017, which it did (id. at 272), that would add $1.9 million to Snodgrass-King's lost operating profits, totaling $7.4 million. (Id. at 249.) If TennCare extended DentaQuest's contracts to September 30, 2018, another $1.845 million would be added to Snodgrass-King's loss, totaling $9.245 million. (Id. )
Generally, "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." Sykes v. Anderson, 625 F.3d 294, 322 (6th Cir. 2010) (quoting Am. Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 475 (6th Cir. 2004) ). A district court should remit a compensatory *871 damages award "only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." Id. (quoting Am. Trim., 383 F.3d at 475 ). "If there is any credible evidence to support a verdict, it should not be set aside." Id. (quoting Am. Trim., 383 F.3d at 475 ).
Here, the only evidence in the record on damages is Faulkner's testimony. The Court has previously found Faulkner's testimony reliable (Doc. No. 335 at 2), and a reasonable jury could rely on it and give it whatever weight it believed is appropriate. The jury did not accept all of Faulkner's analysis because it did not award damages for October 2017-September 2018. Credible evidence supports the jury verdict.
D. VIOLATIONS OF COURT ORDERS
DentaQuest moves for a new trial because Snodgrass-King's counsel violated the Court's orders. (Doc. No. 414 at 14.) The relevant question under Rule 59 is "whether misconduct in a trial of a cause of action is of such a nature that a fair or impartial verdict cannot be reached." City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir. 1980) (quoting Travelers Fire Ins. Co. v. Ranney-Davis Mercantile Co., 173 F.2d 844, 851 (10th Cir. 1949) ). In determining whether "there is a reasonable probability that the verdict of a jury has been influenced by improper conduct, ... a court must examine ... the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself." Id. (internal quotations omitted).
Here, Snodgrass-King's attorneys mentioned the contract value twice during the course of the trial, and the Court gave a curative instruction. (Doc. No. 404 at 225.) When the Court denied the motion for a mistrial, it noted that "we don't have ... consistent conduct regarding the $38 million reference." (Id. at 205); see McMillan v. Castro, 405 F.3d 405, 412 (6th Cir. 2005) ("[D]istrict courts should issue a curative instruction at the time counsel raises an objection to specific questioning or conduct that could be viewed as hostile or biased."). After weighing the City of Cleveland factors, and based on the Court's observations at trial as well as its review of the record itself, the Court does not believe the jury was prejudiced by the amount DentaQuest received from TennCare under their contract. As such, it conditionally denies a new trial on this ground.
On the remainder of the alleged attorney misconduct for Snodgrass-King, DentaQuest did not object to the mentioning of the location of the offices of the testifying witnesses, nor did it object to any mention of a "dental home."[12] The Court is not aware of any order that Snodgrass-King violated by this testimony. Based on the City of Cleveland factors, those issues did not influence the jury and are not grounds for a new trial.
E. PUNITIVE DAMAGES
DentaQuest argues that its conduct was not reprehensible enough to *872 justify a punitive damages award. (Doc. No. 414 at 19.) When the jury finds that the defendant retaliated against the plaintiff's exercise of his First Amendment rights, "the defendant necessarily acts with the purpose of infringing upon the plaintiff's federally protected rights." Id. (citing Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) ). Here, if the jury was reasonable in finding state action and that DentaQuest retaliated against Snodgrass-King's exercise of its First Amendment rights, a reasonable jury could find that DentaQuest acted "with the purpose of infringing upon [Snodgrass-King's] federally protected rights." Id. Accordingly, DentaQuest's Rule 59 motion is conditionally denied on this ground.
Alternatively, DentaQuest argues that the amount of punitive damages violates due process, and that the Court should reduce the punitive damages award to below a 1:1 ratio with compensatory damages. (Doc. No. 414 at 21-23.) Snodgrass-King argues disagrees. (Doc. No. 435 at 18.)
Due process applies to punitive damages awards because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Id. at 417 (quoting BMW of N. Am. v. Gore, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." Id. (citing Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 54, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (O'Connor, dissenting) ). Three considerations guide whether a jury's punitive damage award is excessive: "(1) the degree and reprehensibility of the conduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and the civil penalty imposed in comparable cases." Sykes, 625 F.3d at 322-23 (quoting Gibson v. Moskowitz, 523 F.3d 657, 664 (6th Cir. 2008) ).
The first factor weighs in favor of the jury's punitive damages award. The Court instructed the jury that punitive damages are reserved for "egregious conduct," and they may only be considered if DentaQuest acted "intentionally, recklessly, or maliciously." (Doc. No. 383 at 55.) The jury made this finding by clear and convincing evidence. (Id.; Doc. No. 388 at 2.) Therefore, "the degree and reprehensibility of the conduct" favors Snodgrass-King.
The disparity between the harm suffered by the plaintiff and the punitive damages award is 2:1. That is, the punitive damages award is double the jury's compensatory damage award. (Doc. No. 388 at 1; Doc. No. 390.) While this ratio may favor a plaintiff in a case with lower compensatory damages, in a case with such a "substantial" compensatory damage award, a 2:1 ratio may go beyond the "outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Generally, when the "compensatory damages award [is] large and the defendant's conduct" is reprehensible, a 1:1 ratio is appropriate. Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 488 (6th Cir. 2007) ; see also Burton v. Zwicker & Assocs., PSC, 577 Fed.Appx. 555, 566 (6th Cir. 2014) (upholding the district court's remittitur reducing the amount of damages to a 1:1 ratio from 1.7:1).
Neither side produced any similar cases for the Court to consider the third factor. While DentaQuest provided other First *873 Amendment retaliation claims from district courts within the Sixth Circuit, those cases involved much smaller compensatory damages awards in favor of individuals rather than large companies. (See Doc. No. 414 at 22 (compiling cases) ). As such, those cases did not involve the large amount of compensatory damages that the jury awarded Snodgrass-King here. (Id. )
The jury's punitive damage award shocks the judicial conscience. The Court conditionally grants a remittitur on punitive damages to a 1:1 ratio, reducing the punitive damage award to $7.4 million. The Court also conditionally grants a new trial on both liability and punitive damages should Snodgrass-King reject the conditional remittitur.
F. EVIDENTIARY RULINGS
DentaQuest argues that it is entitled to a new trial because the Court improperly excluded a January 27, 2014 letter (Doc. No. 401-1 at 7). (Doc. No. 414 at 20.) In the letter, TennCare responded to Snodgrass-King's January 16, 2014 letter (Ex. 61) by stating it had no role in the decision to terminate Snodgrass-King from the network. (Doc. No. 406 at 24-26.) DentaQuest offers no new arguments on this issue. The Court stands by its ruling that the letter is not admissible for the reasons stated on the record. (Id. )
DentaQuest argues that the Court erred in limiting DentaQuest to one witness regarding Snodgrass-King's quality of care. (Doc. No. 414 at 25.) However, the Court did not limit DentaQuest in this way. On November 18, 2016, Snodgrass-King filed a motion to exclude the testimony of Lauren Grzegorcyk, a former Snodgrass-King patient who was unsatisfied with Snodgrass-King's quality of care. (Doc. No. 371.) Counsel for Snodgrass-King asked if DentaQuest was going beyond the one witness, and the Court stated, "I don't know what his proof is, but I certainly think that's appropriate, given the proof." (Doc. No. 404 at 307.) DentaQuest then chose to only present one witness on quality of care, which the Court allowed. (Doc. No. 373.) The fact that DentaQuest now regrets its strategy and wishes that it presented four witnesses on quality of care is not a ground for a new trial.
Finally, DentaQuest argues that the accumulation of multiple alleged evidentiary errors require the Court to grant a new trial. (Doc. No. 414 at 26-27.) The Court will not address every evidentiary ruling that went against DentaQuest, but having considered each of DentaQuest's arguments, the Court will adopt its rulings for the reasons given at trial, and its rulings on the expert testimony for the reasons stated at the November 7, 2017 Pretrial Conference. (Doc. No. 335 at 2 (incorporating the reasons given at the pretrial conference) ). These rulings are not grounds for a new trial.
G. CONCLUSION
For the foregoing reasons, pursuant to Rule 50(c), should the Court of Appeals reverse the Court's determination on the Motion for Judgment as a Matter of Law, DentaQuest's Motion for a Remittitur is CONDITIONALLY GRANTED . The punitive damages award is conditionally reduced to $7,400,000.00. DentaQuest's Motion for a New Trial is CONDITIONALLY GRANTED . If Snodgrass-King rejects the remittitur, the Court will hold a new trial both on liability and damages should this case be remanded. If Snodgrass-King conditionally accepts the remittitur, DentaQuest's Motion for a New Trial will be conditionally denied.
*874 III. CONCLUSION
For the foregoing reasons, DentaQuest's Motion for Judgment as a Matter of Law (Doc. No. 411) is GRANTED , DentaQuest's Motion to for Remittitur or a New Trial is CONDITIONALLY GRANTED with respect to the remittitur and CONDITIONALLY GRANTED with respect to the new trial, Snodgrass-King's Motions to Alter Judgment (Doc. No. 410) and for Attorney's Fees (Doc. Nos. 418, 446) are DENIED AS MOOT .
The Court will issue an appropriate order.

Specifically, the parties presented evidence regarding the TennCare Kids Dental Services. While the Bureau of TennCare is much broader than only the TennCare Kids Dental Services, the Court constrains itself to the evidence presented at trial when describing the facts of this case. For a complete description of all services that TennCare provides, see TennCare's website at www.tn.gov/tenncare.

Long is currently the Director of TennCare and the Director of Health Care Finance and Administration for the State of Tennessee. Dr. Wendy Long, TennCare: Division of Health Care Finance & Administration (June 27, 2017), available at https://www.tn.gov/tenncare/article/deputy-commissioner.

This is significant because the Court expressed its concern about the proof on state action at the pretrial conference. At that time, Snodgrass-King's counsel responded that it would present Gillcrist's testimony to prove state action. This did not happen. Nevertheless, there is circumstantial evidence about what TennCare did or did not do prior to the 2013 decision to exclude Snodgrass-King that becomes critical to the state action analysis.

Blackwell testified that she could not recall if DentaQuest's Sales Director Mark Sniegocki was at the meeting, although she stated that he testified in a previous deposition that he was not. (Doc. No. 404 at 183-84.)

The contract did not allow DentaQuest to contract with mobile units unless they are located in areas "underserved by community providers." (Doc. No. 403 at 101.)

This is important because this provision of the contract formed the basis of DentaQuest's belief that the State had a preference against large group providers. TennCare's subsequent waiving of the requirement, in the light most favorable to Snodgrass-King, shows that the State did not actually have a preference against large group providers. (Doc. No. 403 at 99-100.)

Snodgrass-King argued to the jury and at oral argument that its providers met all the criteria in this letter. DentaQuest's exclusion of Snodgrass-King from the TennCare network, therefore, indicates a retaliatory motive.

In addition to Snodgrass-King, DentaQuest also did not invite approximately two hundred other providers into the network. (Doc. No. 400 at 222.)

Dr. Urbanek, Snodgrass-King's oral surgeon, did not get revalidated by TennCare and therefore was not in TennCare's pool of providers, so DentaQuest was unable to consider him for its network. (Ex. 651 at 4836.)

Snodgrass-King also cites the concurrence in Paige v. Coyner, 614 F.3d 273 (6th Cir. 2010). However, there, the majority rejected the state action analysis, finding that a state actor was being sued for its own actions. Id. at 280. Thus, the Court does not give weight to a concurrence that the majority specifically rejected.

There is no binding case that explicitly states whether the State must have an unconstitutional motivation under the state action analysis. However, as discussed in Blum , Campbell , Wilcher , and S.H.A.R.K. , as well as the numerous other cases cited in Section I of this Memorandum Opinion, no case discussed or required the State to have an unconstitutional motivation to constitute state action under § 1983. As such, the Court did not include this in its jury instructions.

The other alleged errors DentaQuest raises in this section were raised in a perfunctory manner without analysis. The Court, however, has considered all of DentaQuest's arguments reviewed the citations to the record (Doc. No. 415 at 14) and determined that a new trial is not warranted for attorney misconduct.