**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0301n.06

Nos. 18-5271/5284

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

SNODGRASS-KING PEDIATRIC DENTAL )
ASSOCIATES, P.C.; DAVID J. SNODGRASS, )
D.D.S., )
                 )
       **Plaintiffs-Appellants/Cross-Appellees,** )
                 )
v. )
                 )
DENTAQUEST USA INSURANCE COMPANY, )
INC., )
                 )
       **Defendant-Appellee/Cross-Appellant.** )
                 )

**FILED**
Jun 11, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

**OPINION**

Before: MERRITT, GUY, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** The "First and Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action . . . ." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). Generally, a private party is not considered a state actor unless one of the state-action tests outlined in our precedent applies. The question in this case is whether there was a legally sufficient basis upon which a reasonable jury could find that a private party was a state actor under the state-compulsion test. In a well-reasoned opinion, the district court decided that there was not. We agree.

**I. BACKGROUND**

TennCare is the State of Tennessee's Medicaid program; it pays for medical procedures for persons who are unable to pay. This dispute specifically involves the TennCare Kids Dental Services program. Tennessee is not an "any willing provider" state, which means that the State

does not have to include any and all willing providers who want to participate in the TennCare network. R. 400 (Trial Tr. II at 200–01) (Page ID #11032–33). Instead, the State contracts with a dental-benefits manager, and that dental-benefits manager then selects a network of dental providers to treat patients. R. 403 (Trial Tr. III at 11) (Page ID #11268); R. 478-11 (Contract).

DentaQuest USA Insurance Company, Inc. ("DentaQuest") has been TennCare's dental-benefits manager since May 2013. R. 478-11 (Contract) (Page ID #14226). In 2004, DentaQuest acquired Doral Dental, which served as the dental-benefits manager from 2002 to 2010. R. 403 (Trial Tr. III at 11) (Page ID #11268). Doral eventually changed its name to DentaQuest of TennCare, LLC. *Id.* Snodgrass-King Pediatric is a dental practice group that has five offices throughout Middle Tennessee, R. 399 (Trial Tr. I-B at 83–84) (Page ID #10813–14), and is managed in part by Dr. David Snodgrass (collectively, "Snodgrass"). From 1998 to 2003, and again from 2009 to 2013, Snodgrass treated TennCare dental patients. R. 400 (Trial Tr. II at 68–69) (Page ID #10900–01). This case arises from DentaQuest's 2013 decision to exclude Snodgrass from the TennCare network.

## A. Prior Lawsuits

To provide context for the instant dispute, it is helpful to recount briefly the history between Snodgrass, TennCare, and DentaQuest (as well as Doral, the DentaQuest predecessor). This lawsuit is the third in a trilogy of First Amendment retaliation suits filed by Snodgrass. The first two settled, with the defendants admitting no wrongdoing. The district court provides a fuller overview of the history of this tense relationship in its post-trial opinion. *See Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co.*, 295 F. Supp. 3d 843, 851–54 (M.D.

Tenn. 2018). These suits provide some helpful background and are relevant to Snodgrass's First Amendment activity. The facts relevant to state action, however, center on DentaQuest's *2013* decision to exclude Snodgrass from TennCare and the lead up to that decision.

### 1. First Lawsuit

Snodgrass began voicing concerns to various government and TennCare officials about DentaQuest's (or Doral's) management of TennCare "from the month after Doral Dental entered the State." R. 400 (Trial Tr. II at 140) (Page ID #10972). In 2003, Doral excluded Snodgrass from the TennCare network, purportedly because of Snodgrass's excessive usage of stainless-steel crowns. R. 398 (Trial Tr. V at 224) (Page ID #10693). As a result of Snodgrass's exclusion, their patients began calling and writing letters to TennCare's Dental Director, Dr. James Gillcrist. R. 400 (Trial Tr. II at 75–76) (Page ID #10907–08). Gillcrist apparently told Dr. Snodgrass's partner, Dr. King, that if the calls and letters continued, Gillcrist would have Snodgrass investigated and shutdown. *Id.* A subsequent Tennessee Bureau of Investigation audit, however, found no wrongdoing. *Id.* at 76–78 (Page ID #10908–10). Eventually, Snodgrass reapplied to participate in TennCare. These requests were denied. *Id.* at 143 (Page ID #10975). After that, Dr. Snodgrass filed his first lawsuit against Doral based on the 2003 exclusion. *See* R. 476-5 (2008 Compl.) (Page ID #13861). The two sides settled in 2009. Doral admitted no wrongdoing. R. 476-6 (2009 Settlement at ¶ 19) (Page ID #13873).

### 2. 2009 Settlement & Second Lawsuit

As part of the 2009 settlement, Doral agreed to credential and permit Snodgrass to participate in TennCare. *Id.* at ¶¶ 3–4 (Page ID #13870). Then in April 2009, TennCare apparently

wanted to delay Snodgrass's credentialing (and thus readmission into TennCare).  R. 477-9 (Page ID #14176) (an April 2009 Doral internal email stating that, "[W]e were asked by [TennCare's new general counsel] to hold on credentialing [S]nodgrass providers until today . . . . [TennCare] . . . has a policy directly related to [S]nodgrass which I think is designed to keep him out or we [i.e., Doral] incur penalties.").  Eventually, Snodgrass threatened "aggressive action against" Doral if they did not credential the dentists, so Doral did so.  *Id.*  Once Snodgrass joined the network, Doral required Snodgrass to obtain preapproval for stainless-steel crowns.  R. 400 (Trial Tr. II at 149) (Page ID #10981).  When Snodgrass refused to obtain preapproval, Doral then withheld payments to Snodgrass, and Dr. Snodgrass filed another lawsuit in 2010.  *Id.*; R. 476-7 (2010 Compl.) (Page ID #13878).  The case settled in 2011, and the defendants admitted no wrongdoing.  R. 476-8 (2011 Settlement at ¶ 8(a)) (Page ID #13937).

**B.  This Lawsuit & Snodgrass's 2013 Exclusion from TennCare**

In 2010, DentaQuest lost the TennCare dental-benefits-manager contract to Delta Dental.  R. 400 (Trial Tr. II at 93) (Page ID #10925).  Delta admitted almost all the Snodgrass providers into TennCare.  *Id.* at 109, 212 (Page ID #10941, 11044).  Meanwhile, prior to DentaQuest's preparations to bid for a new 2013 contract, a 2011 DentaQuest internal email noted that Snodgrass was a "critical provider" in Tennessee, but that Snodgrass was "[n]ot a supporter of DQ [i.e., DentaQuest]."  R. 479-13 at 4 (Page ID #14449).

**1.  DentaQuest Meets with TennCare**

At some point in 2012, DentaQuest began preparing for an upcoming February 2013 Request For Proposal ("RFP") to bid for a new TennCare contract.  Around December 2012,

DentaQuest executives met with Gillcrist and Dr. Wendy Long (TennCare's Chief Medical Officer). TennCare told DentaQuest that TennCare did not intend to renew its contract with Delta. TennCare and DentaQuest also discussed the type of arrangement TennCare wanted with its next dental-benefits manager—specifically, the possibility of a risk-based structure where the dental-benefits manager would share in profits and losses. *See generally* R. 404 (Trial Tr. IV at 182–86) (Page ID #11630–34).

### 2. DentaQuest Internal Emails that Follow the TennCare Meeting

Following this meeting, several internal DentaQuest emails were exchanged. First, on December 20, 2012, Cheryl Polmatier, a DentaQuest executive who did not attend the December 2012 meeting, sent an email stating:

> I just received the [Tennessee] data that I had requested on the old TennCare network, current CoverKids network, large groups, etc. so we can have an internal discussion based upon concerns that [other DentaQuest executives] shared about *the State's position on large groups, Snodgrass and others that we need to "keep out" of the network.*

R. 478-4 (Page ID #14201) (emphasis added). On December 27, Polmatier sent another email:

> It's my understanding from previous conversations that *there are certain providers and large provider groups that TennCare would prefer that we not have in our network. . . .*
>
> *. . . Let me know who knows which offices (besides Snodgrass)*, and from there we can reach out to [DentaQuest's in-house counsel] and understand the position we need to take in communication regarding our network build for TennCare.

R. 478-5 (Page ID #14204) (emphasis added). Michele Blackwell, a Vice President at DentaQuest, responded, "I do not believe any of us know specific providers to date," but explained that what would "likely happen is once TennCare chooses its dental vendor they will provide a list of

provider offices which have significant [utilization-review] issues and ask the [dental-benefits manager] to take this into account when finalizing its network." R. 479-6 (Page ID #14382).

Then a January 2, 2013 email showed that DentaQuest was working on its proposed TennCare network for the RFP and, in that context, DentaQuest was reviewing a Snodgrass settlement to ensure there were no "problems with his settlement language." R. 478-3 (Page ID #14198). After that, Polmatier sent additional emails on January 8:

> If we wanted to amend any CoverKids provider, *with the exception of Snodgrass* (33 providers), we'd be amending approximately 720 unique providers to participate in Tenncare. . . . If we know who we want to invite, I think we could start to amend….but it will create noise for anyone we don't invite who wants in. But if we're going to amend the entire [CoverKids] network, *everyone but Snodgrass*, I think it wouldn't hurt to start now. . . .

R. 478-6 (Page ID #14206–08) (emphasis added). Polmatier also testified that as of January 2013, she had decided that if DentaQuest won the TennCare contract, she did not want Snodgrass in the network. R. 403 (Trial Tr. III at 57–58) (Page ID #11314–15).

By around January 24, 2013, DentaQuest had formulated "Network Goals." R. 479-1 (Page ID #14368). Barry Major, a DentaQuest employee (who did not attend the December 2012 meeting), authored these draft goals, which included, "Keep Dr. Snodgrass out of the network." *Id.* Major—called as a witness by Snodgrass—testified that he wanted Snodgrass kept out of the network because of a prior altercation between Dr. Snodgrass and another DentaQuest employee, Kevin Miller. R. 404 (Trial Tr. IV at 69–71) (Page ID #11517–19). Further, Major testified that he had not talked to anyone from the State about Snodgrass. *Id.* Ultimately, Polmatier requested that the "Keep Dr. Snodgrass out" be deleted (and it was) from the final version of the "Network Goals" document submitted with the RFP. *Id.* at 73 (Page ID #11521).

6

### 3. TennCare Releases the RFP and DentaQuest Wins the Contract

On February 1, 2013, Tennessee released the RFP for a new dental-benefits manager for TennCare. R. 403 (Trial Tr. III at 25–26) (Page ID #11282–83). On February 5, Polmatier sent an email that explained that DentaQuest "had an issue with a problem provider, Dr. Snodgrass, and long story short, he sued us to participate with Tenncare and Coverkids, and participates with Coverkids today." R. 479-2 (Page ID #14370). The next week, on February 13, Polmatier sent an email about the RFP with an attached PowerPoint. R. 478-15 (Page ID #14355). The PowerPoint's summary slide noted that, "According to the State's Dental Director, the RFP winner will be largely based on a **carefully selected network**." R. 479-8 (Page ID #14389). It further stated that, "The winner [of the RFP] will be given five months to build out a network prior to the go live date of Oct 1[,]" and that, "No attempt to contract with providers should be implemented prior to announcement of bid winner." *Id.* The PowerPoint also included six "Large Provider Groups," which included Snodgrass. *Id.* (Page ID #14402).

On April 2, 2013, DentaQuest submitted its response to the RFP. About one month later, on May 1, 2013, Tennessee awarded the TennCare dental-benefits-manager contract to DentaQuest. R. 403 (Trial Tr. III at 26) (Page ID #11283). Two days after DentaQuest won the contract, Major sent Polmatier an email, stating:

> I was thinking about how to deal with the cases where Analytics recommendations to exclude only apply to a subset of providers at a particular [location]. What do you think of the following process?
>
> [Describes a process that includes allowing a location into the network if less than 50% of the billing from the location came from "Tier 4 providers," with the "Tiers" being based on utilization-review data]

7

> *The only problem is that we'd have to figure out a way to justify excluding Snodgrass due to the fact that he would be allowed to stay in the network using this criteria.* We could lower the criteria to 40% but then we'd lose some other providers. . . . If not, *we may need to get a little more creative.*

R. 479-3 (May 3, 2013 Email) (Page ID #14373) (emphasis added). Ultimately, DentaQuest excluded locations where all the providers were at a Tier 4 level. R. 404 (Trial Tr. IV at 15–16) (Page ID #11463–64). DentaQuest thus listed Snodgrass as an "include entity" at one point because Snodgrass did not meet this "exclude" criterion. *Id.* at 15 (Page ID #11463).

On May 15, the TennCare-DentaQuest contract was signed. R. 478-11 (Contract) (Page ID #14226). The contract contained a specific provision for providers, like Snodgrass, with multiple service locations. R. 478-12 (Contract at ¶ A.51) (Page ID #14264). This provision stated:

> [N]o entity owning or operating multiple practice locations nor any individual provider nor group of providers operating multiple practice locations, may be credentialed by the Contractor [i.e., DentaQuest] at more than one location at the time of the initial credentialing by the Contractor. . . . The requirement of one initial location may be waived, *at the sole discretion of the Contractor*, only for providers in good standing who are current TennCare providers, with a proven record of delivery of quality dental care, at the time of the Contract start date.

*Id.* (emphasis added).

On July 26, 2013, DentaQuest sent a letter to all providers in Tennessee that explained DentaQuest's administration of the TennCare program would begin on October 1, 2013. R. 476-9 (Page ID #13940). The letter described two necessary processes to be considered for the TennCare network: (1) revalidation by TennCare; and (2) the eligibility determination *by DentaQuest*. *Id.* This second process involved considerations such as satisfying a "peer-reviewed

8

selection process and criteria." *Id.* The criteria did not include the number of offices that a provider might have.

Around September 2013, TennCare sent DentaQuest a "pool of providers" that TennCare validated. R. 404 (Trial Tr. IV at 22) (Page ID #11470). TennCare validated all the Snodgrass providers, R. 403 (Trial Tr. III at 48) (Page ID #11305), except one oral surgeon, R. 479-11 (Page ID #14429). All the Snodgrass providers applied to be in the TennCare network. R. 400 (Trial Tr. II at 177) (Page ID #11009).

### 4. DentaQuest Excludes Snodgrass From the TennCare Network

Then, on September 19, 2013, Major sent Polmatier an email that included the TennCare network selections. R. 479-10 (Page ID #14407). These selections were made, in part, by applying a so-called "large-provider rule." This rule, which was not documented in any written policy, supposedly applied to providers with three or more locations in areas without access needs—but of the providers operating in Tennessee, DentaQuest applied this rule to Snodgrass alone. R. 404 (Trial Tr. IV at 31) (Page ID #11479). An accompanying spreadsheet to Major's email showed that the Snodgrass providers were excluded because Dr. Snodgrass was labeled as a "secondary network," meaning he ran afoul of the large-provider rule, and the other providers were "[a]ffiliated w[ith] [the] secondary network." R. 479-10 (Page ID #14415, 14423–24). Major explained that those in a "secondary network" consisted of "[p]roviders . . . that are currently participating at excluded locations that we would consider letting in if they worked for one of our included locations. Most of these are Snodgrass providers." *Id.* (Page ID #11407). DentaQuest

9

did not list Snodgrass as a provider that was excluded because of utilization-review problems. *See id.*

On October 1, 2013, DentaQuest began to manage the TennCare network. R. 403 (Trial Tr. III at 26) (Page ID #11283). Months later, on December 12, 2013, Snodgrass's Chief Operating Officer emailed DentaQuest asking for an update on whether Snodgrass would be credentialed. R. 478-7 (Page ID #14212).

On December 16, DentaQuest sent Snodgrass providers (and other excluded providers) a letter that indicated Snodgrass's participation in TennCare was terminated without cause and, effective January 1, 2014, Snodgrass could no longer submit claims for reimbursement to TennCare. R. 476-11 (Page ID #13949). At trial, Major testified that no one from the State ever told him or pressured him to exclude Snodgrass from the network. R. 404 at (Trial Tr. IV at 47–48) (Page ID #11495–96). Polmatier testified the same. *Id.* at 72, 83 (Page ID #11520, 11531).

On January 3, 2014 Snodgrass sent DentaQuest a letter asking DentaQuest to reconsider its decision to exclude Snodgrass or to give reasons for the decision. R. 476-12 (Page ID #13952). DentaQuest responded and stated that it would not reconsider. R. 476-13 (Page ID #13957). The letter further explained that DentaQuest had an "extensive and widely distributed network" in the areas where Snodgrass operated, and therefore, Snodgrass was not included in the network. *Id.* (Page ID #13957–58).

DentaQuest made several admissions in this case. First, DentaQuest excluded Snodgrass because of the large-provider rule. R. 403 (Trial Tr. III at 47) (Page ID #11304). Second, of the providers that practiced in Tennessee, DentaQuest applied this rule to Snodgrass alone. *Id.* at 51–

52 (Page ID #11308–09). And third, DentaQuest admitted that its "decision not to include Snodgrass-King providers in the DentaQuest network in 2013 was not based upon an evaluation of the quality or efficiency of care provided by Snodgrass-King providers." R. 406 (Trial Tr. VI at 80) (Page ID #11839). Snodgrass also presented an expert at trial who, after reviewing DentaQuest's methodology and data, concluded that "the data did not support exclusion of Snodgrass-King from the provider network." R. 403 (Trial Tr. III at 133–34) (Page ID #11390–91); *see also id.* at 161–62 (Page ID #11418–19).

### 5. Snodgrass Files this Lawsuit

Snodgrass filed this lawsuit in March 2014. This time, the parties did not reach a settlement. As relevant here, Snodgrass claimed that DentaQuest and TennCare retaliated against Snodgrass in violation of their First Amendment rights. *See* R. 1 (Compl.). DentaQuest is the sole remaining defendant.

## C. District Court's Summary Judgment Ruling & the Pretrial Conference

The district court denied DentaQuest's motion for summary judgment as to the state-action issue, the First Amendment claim, and damages claims no longer relevant to this appeal (because, as will be explained, we affirm the district court's post-trial state-action ruling). *See Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co.*, No. 3:14-cv-0654, 2016 WL 4705711, at *13 (M.D. Tenn. Sept. 2, 2016). In its opinion, the district court relied heavily on the email evidence presented by Snodgrass. *See id.* at *5–6.

But later, at the November 7, 2016 pretrial conference, the district court expressed concern about Snodgrass's proof on state action. R. 395 (Pretrial Conf. Tr. at 2–6) (Page ID #10453–57);

*see also Snodgrass-King*, 295 F. Supp. at 850 n.3. In response, Snodgrass represented that "[t]here's going to be evidence of Dr. Gillcrist [from TennCare] and his involvement specifically with respect to Dr. Snodgrass." R. 395 (Pretrial Conf. Tr. at 3) (Page ID #10454); *see also id.* at 6 (Page ID #10457) (Snodgrass's counsel stating that Gillcrist and other witnesses "will go to [prove state action]."). Specifically, the district court noted that it was trying to discern "the anticipated proof that the State of Tennessee had a motive to retaliate, and . . . how did the State act on that . . . by precluding plaintiffs from being in [the TennCare network]." *Id.* at 6 (Page ID #10457). In its post-trial opinion, the district court noted that, "[n]o one from TennCare testified at trial." *Snodgrass-King*, 295 F. Supp. 3d at 850.

In sum, it appears that before trial, despite denying summary judgment, the district court was concerned that the email evidence, without more, may not be legally sufficient to support a finding of state action. Snodgrass placated these concerns by stating that witnesses would show TennCare's involvement. The district court later concluded that, "[t]his did not happen." *Id.* at 850 n.3.

## D. Jury Award for Snodgrass & the Judgment as a Matter of Law Ruling

The case was tried before a jury and Snodgrass prevailed. But on February 23, 2018, the district court granted DentaQuest's motion for judgment as a matter of law and thus vacated the jury verdict. *Snodgrass-King*, 295 F. Supp. 3d at 849. On the issue of state action, and specifically the state-compulsion test, the district court concluded that, "[a] reasonable jury might conclude that TennCare 'approved,' 'acquiesced,' 'encouraged,' or even 'incentivized' DentaQuest's 2013 exclusion of Snodgrass-King from the TennCare network. But this is not legally sufficient to

constitute State action." *Id.* at 866. "The main issue with Snodgrass-King's theory" on state action, the district court found, was "that there is no evidence to support it." *Id.* at 865. The district court noted that "it is undisputed that DentaQuest made the final decision on which providers were allowed in the network in October 2013," and the district court concluded that "no evidence [supports the contention] that TennCare *significantly encouraged or coerced* this result." *Id.* at 865–66 (emphasis added).

## II. STANDARD OF REVIEW

We review de novo a district court's grant of a motion for judgment as a matter of law. *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). Under Federal Rule of Civil Procedure 50, a court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). In the specific context of this case, there must have been a "legally sufficient evidentiary basis" upon which a reasonable jury could find state action. *See id.*

## III. STATE ACTION & THE STATE COMPULSION TEST

Section 1983 provides a cause of action for First Amendment retaliation if a plaintiff shows that: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct." *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). But the "First and Fourteenth Amendment protections, codified in

13

42 U.S.C. § 1983, are triggered only in the presence of state action . . . ." *Lansing*, 202 F.3d at 828.

"A private party, acting on its own, cannot ordinarily be said to deprive a citizen of her right to Free Speech." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007); *see also Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 783 (6th Cir. 2007) ("As a general rule, [s]ection 1983 does not . . . prohibit the conduct of private parties acting in their individual capacities.") (alteration in original) (internal quotation marks omitted). A private party "can be held to constitutional standards" only "when its actions so approximate state action that they may be fairly attributed to the state." *S.H.A.R.K. v. Metro Parks Serving Summit Cty.* ("*SHARK*"), 499 F.3d 533, 564 (6th Cir. 2007) (quoting *Lansing*, 202 F.3d at 828).

We have recognized four tests to determine whether a private party's "challenged conduct is fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014); *see also id.* at 362 n.6 (noting that precedent often enumerates three tests, but recent cases include separate discussions on the entwinement test). Only the state-compulsion test is relevant here because Snodgrass has failed to develop an argument on the nexus test that was also at issue in the district court. *See SHARK*, 499 F.3d at 564–65. The nexus argument is thus forfeited. *See id.*

"The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id.* at 565 (quoting *Lansing*, 202 F.3d at 829); *see also Blum v.*

14

*Yaretsky*, 457 U.S. 991, 1004 (1982). The Supreme Court has explained that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05. More is needed. "[A] plaintiff must allege and prove that state officials coerced or participated in the [private actor's] decision-making" process. *Wilcher*, 498 F.3d at 520. The inquiry "begins by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum*, 457 U.S. at 1004). The state-action analysis is, therefore, necessarily "a normative and fact-bound endeavor." *SHARK*, 499 F.3d at 564 (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001)).

The jury here found that DentaQuest's retaliatory actions against Snodgrass could be attributed to the State of Tennessee, and specifically TennCare. The district judge determined that no evidence could support this finding. Based on the record evidence in this case, the district court correctly concluded that "[t]he main issue with Snodgrass-King's theory is that there is no evidence to support it." *Snodgrass-King*, 295 F. Supp. 3d at 865. On appeal, Snodgrass argues that the "[t]he emails alone are enough" to supply legally sufficient evidence of state action, *see* First Br. at 34, and Snodgrass offers three additional grounds to support state action. For the reasons explained below, the emails are not enough, and the other grounds are not persuasive.

Even in the light most favorable to Snodgrass, the emails do not show the sort of coercion, participation, or significant encouragement required by our precedent. For one, the emails precede Tennessee awarding DentaQuest the dental-benefits-manager contract. The one exception is the

May 3, 2013 email from Major to Polmatier that indicated that DentaQuest may need to "get a little more creative" to justify excluding Snodgrass. R. 479-3 (Page ID #14373). Although the emails as a whole evidence TennCare's "position" and "preference" to "keep out" Snodgrass, the contract between DentaQuest and TennCare itself leaves total discretion in the hands of DentaQuest as it relates to providers with "multiple practice locations," *see* R. 478-12 (Contract at ¶ A.51) (Page ID #14264), including Snodgrass. Moreover, the process for admission into the TennCare network was twofold: (1) revalidation by TennCare, and (2) an eligibility determination *by DentaQuest*. The fact is that TennCare revalidated all Snodgrass providers, except one oral surgeon. R. 403 (Trial Tr. III at 48) (Page ID #11303); R. 479-11 (Page ID #14429). Snodgrass presented no evidence that TennCare was involved in or coerced the actual decision-making process to exclude Snodgrass in 2013. *See Wilcher*, 498 F.3d at 520. Once DentaQuest won the TennCare contract and once TennCare revalidated the Snodgrass providers, the State had no say in this matter, and DentaQuest "made a free-will choice to" exclude Snodgrass. *See SHARK*, 499 F.3d at 565; *see also Sullivan*, 525 U.S. at 54 ("Such permission of a private choice cannot support a finding of state action."). No evidence suggests a contrary conclusion.

To be clear, when a State contracts out the management of its Medicaid program(s) to a private party, we do not hold that the private contractor can never be deemed a state actor. We simply hold "that in order to support such a theory, a plaintiff must [present evidence] and prove that state officials coerced or participated in the company's decision-making to the extent required to trigger state actor status." *See Wilcher*, 498 F.3d at 520. Here, however, the jury did "not have

16

a legally sufficient evidentiary basis to find" that DentaQuest was a state actor. *See* FED. R. CIV. P. 50(a)(1).

A review of our case law shows why. On more compelling facts, we have not found state action. For example, in *SHARK*, park rangers (who were state actors) asked a private contractor in charge of a deer-culling program if the private contractor was able to delete tapes that captured images of the deer cull. 499 F.3d at 558. An animal rights organization had installed cameras in the park and intended to share the tapes with news organizations. *Id.* There, state officials called the private contractor into the park, expressed concerns about the tapes and asked if the images on them could be erased, and then the private contractor, "addressing [the rangers'] concerns," erased the images. *Id.* Even on these facts, we held that the state-compulsion test was not satisfied. *Id.* at 565 ("[T]o the extent that [the state actors] 'encouraged' [the private contractor], this is not the type of significant encouragement which would turn [the private contractor's] choice to delete the tapes into that of government action.").

Moreover, in *Wilcher*, the City of Akron entered into a franchise agreement with Time Warner, a private actor, to administer the City's public-access television. 498 F.3d at 518. Under the agreement, Time Warner could "promulgate rules and regulations for the [public-access] channel; but before new rules [could] become effective, they [were] 'subject to approval of [the City], whose approval [could] not be unreasonably withheld.'" *Id.* A producer of public-access programming claimed that, in response to the City's concerns regarding citizen complaints about sexually explicit content on the channel, Time Warner instituted a $25 fee for each tape submitted for broadcast. *Id.* Per the franchise agreement, Time Warner submitted this regulation to the City

17

and the mayor approved it. *Id.* Again, we held that the there was no state action. *Id.* at 520 (reasoning that the plaintiff failed to allege that city officials coerced or participated in the private actor's decision-making).

No other cases help Snodgrass. Although TennCare's "position" might have been to "keep out" Snodgrass, "[t]here is nothing in the record to show that . . . state law or any state entity required [DentaQuest] to take any . . . actions" against Snodgrass. *See Campbell*, 509 F.3d at 784; *cf. id.* (a state offering incentives to a private actor to make a certain decision, without more, is not sufficient to support state action under the nexus test). In this case, there is no evidence of any incentives, or threatened penalties, offered by TennCare to DentaQuest related to the 2013 decision. To the contrary, after TennCare revalidated Snodgrass providers, the decision-making authority was entirely in the hands of DentaQuest. Snodgrass presented no evidence to suggest that TennCare, after it awarded DentaQuest the contract and revalidated Snodgrass, was involved in the subsequent decision to exclude. Furthermore, that DentaQuest was bidding on a lucrative contract (and won that contract) is not sufficient to find state action. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) ("[A]lthough the state provided a significant portion of the funding of [the private actor], the state did not choose the members of the Board of Trustees, nor did it choose the executive director or make personnel policies or decisions for [the private actor]. Thus, nothing in the record suggests that the state exercised such coercive power or provided such encouragement as to make [the private actor's] personnel decision state action [under the state-compulsion test].").

Finally, Snodgrass offers two other arguments for finding state action; neither is persuasive. First, the prior lawsuits are relevant to Snodgrass's underlying First Amendment claim. But these suits do not move the needle on state compulsion for "the specific conduct of which the plaintiff complains" in this lawsuit—the *2013* decision to exclude. *See Blum*, 457 U.S. at 1004. At any rate, the prior lawsuits, contrary to Snodgrass's assertions on appeal, did not establish that DentaQuest or TennCare retaliated against Snodgrass in the past because the defendants admitted to no wrongdoing. Second, the fact that *DentaQuest* formulated the "large-provider rule" as a pretext and that there was no other medical reason to exclude Snodgrass are not evidence, in and of themselves, that *TennCare* was involved in the decision to exclude Snodgrass. And as mentioned, the witnesses that Snodgrass called at trial also disavowed any State involvement.

## IV. CONCLUSION

There is considerable evidence in this case about what *DentaQuest* did. Not so for what *the State* did to coerce or strongly encourage DentaQuest. Accordingly, we affirm, and we need not address the issues raised by the parties on cross-appeal.

**RALPH B. GUY, JR., Circuit Judge, dissenting.** I cannot agree that the evidence presented at trial was insufficient to permit a reasonable juror to find state action under the state-compulsion test. Although the decision granting DentaQuest's renewed motion for judgment as a matter of law is reviewed de novo, we nonetheless apply deferential standards to the jury's verdict. *See Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018). Namely, we must view all of the evidence and draw all reasonable inferences in the light most favorable to Snodgrass-King and may "not weigh the evidence, evaluate the credibility of the witnesses, or substitute [our] judgment for that of the jury." *Id*. (citation omitted). A Rule 50(b) motion may be granted only if there was no genuine issue of material fact for the jury to decide, and "reasonable minds could not come to a conclusion other than one favoring the movant." *Id*. (citation omitted).

Here, the jury was properly instructed with respect to the state-compulsion test that "Snodgrass-King must show that the State of Tennessee provided such coercion or significant encouragement, whether overtly or covertly, that the specific action in question—the decision not to invite Snodgrass-King into the TennCare network in 2013—is attributable to the State of Tennessee." (Page ID # 10394.) The instructions explained that it would not be enough to show that DentaQuest had a close relationship to the state, contracted with the state, received state funds, or administered a state program. (Page ID # 10393-94.) Importantly, the jury was also instructed that the State's mere approval of or acquiescence to DentaQuest's private decision would not be sufficient to prove state action. (Page ID # 10393.) The jury found there was state action, and I cannot conclude that there was no evidence to support the jury's finding in that regard.

DentaQuest insisted that it was the decision maker. It is, of course, precisely for that reason that it was necessary to prove state action. Nor is it dispositive that witnesses disavowed any state involvement. It is true that there was no direct evidence of a demand or quid pro quo—either of which would be sufficient but not necessary to prove state action. Rather, Snodgrass-King relied on circumstantial evidence to meet that burden. I conclude, as the district court did in denying summary judgment, that a reasonable inference can be drawn from DentaQuest's internal emails that TennCare "covertly pressured or provided significant encouragement to [DentaQuest] to formulate its provider network in such a way as to exclude [Snodgrass-King]." (Page ID # 7254.) Moreover, although the claim concerns the 2013 decision, the jury could consider evidence that TennCare pressured DentaQuest both to delay its reinstatement of Snodgrass-King after settlement of the first lawsuit and to enforce a new policy that impacted only Snodgrass-King and led to the second lawsuit.

Ultimately, the evidence detailed by the district court and the parties on appeal is sufficient to support a reasonable inference that TennCare pressured DentaQuest in the past, said it wanted to replace Delta Dental in part because it "let anyone into the network," and conveyed in the closed-door pre-bid meeting that DentaQuest was to do whatever was necessary to keep Snodgrass-King out of the network if DentaQuest was to win back the coveted contract. Although more than one reasonable inference may be drawn from DentaQuest's emails, a reasonable jury could also conclude that DentaQuest understood TennCare's position vis-à-vis Snodgrass-King; made pre-bid plans to exclude Snodgrass-King from any future network at TennCare's request; and, after being awarded a contract that could be terminated for any reason, excluded Snodgrass-King under

21

circumstances that a jury could find were pretextual.  To the extent other reasonable inferences may be drawn, reasonable minds could not come to but one conclusion favoring DentaQuest. Because there was evidence to support the finding of state action, I respectfully dissent.